695 So.2d 278 (1997)
Danny Harold ROLLING, Appellant,
v.
STATE of Florida, Appellee.
No. 83638.
Supreme Court of Florida.
March 20, 1997.
Rehearing Denied June 12, 1997.
*281 Nancy A. Daniels, Public Defender; and Nada M. Carey, David A. Davis, Paula S. Saunders and Michael Wasserman, Assistant Public Defenders, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Carolyn Snurkowski, Assistant Attorney General, Tallahassee, for Appellee.

REVISED OPINION
PER CURIAM.
Danny Harold Rolling, a prisoner under sentence of death, pled guilty to the murders of five college studentsSonya Larson, Christina Powell, Christa Hoyt, Manual Taboada and Tracy Paulesand other related charges. He now appeals the trial court's imposition of five death sentences after adjudicating him guilty of each of the murders and holding a penalty phase proceeding pursuant to section 921.141(1), Florida Statutes (1995). We have jurisdiction under article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed below, we affirm the imposition of the death sentences.

FACTS OF THE CASE
The record reflects that in the early morning hours of August 24, 1990, Danny Rolling, armed with both an automatic pistol and a Marine Corps K-Bar knife, broke through the rear door of an apartment shared by college students Sonya Larson and Christina Powell. Upon entering the apartment, Rolling observed Christina Powell asleep on the downstairs couch. He stood over her briefly, but did not awaken her.
Rolling then crept upstairs where he found Sonya Larson asleep in her bedroom. After pausing to decide with which young woman he desired to have sexual relations, he attacked Ms. Larson as she lay in her bed, stabbing her first in the upper chest area.
*282 He then placed a double strip of duct tape over her mouth to muffle her cries and continued to stab her as she unsuccessfully attempted to fend off his blows. During the attack, she was stabbed on her arms and received a slashing blow to her left thigh. Ms. Larson maintained consciousness for less than a minute and died as a direct result of the stab wounds inflicted by Rolling.
After killing Ms. Larson, Rolling returned to the downstairs of the apartment where Ms. Powell remained asleep. He pressed a double strip of tape over her mouth and taped her hands behind her back. Rolling cut off her clothing and undergarments with the K-Bar knife and sexually battered Ms. Powell, threatening her with the knife. Thereafter, Rolling forced her to lie facedown on the floor near the couch and stabbed her five times in the back, causing her death. Rolling posed the bodies of the victims and left the apartment.
Approximately forty-two hours later, during the evening hours of Saturday, August 25, Rolling broke into the apartment of college student Christa Hoyt, located about two miles away from the first crime scene, by prying open the sliding glass door with a screwdriver. Armed with the same automatic pistol and K-Bar knife, Rolling waited in the living room for the arrival of Ms. Hoyt, a young woman into whose bedroom he had peeked a few days earlier. When Ms. Hoyt eventually returned home at about 11 a.m., Rolling surprised her from behind, placing her in a choke-hold and subduing her after a brief struggle. He taped her mouth and her hands and then led her into her bedroom where, after cutting and tearing off her clothing and undergarments, he forced her onto her bed, threatened her with his knife, and sexually battered her. Rolling subsequently turned Ms. Hoyt facedown in her bed and stabbed her through the back, rupturing her aorta and killing her. Just as he had done with his first two victims, Rolling posed the body of his third victim and left the apartment.
A little over a day later, at approximately 3 a.m. on August 27, Rolling entered a third apartment, occupied by roommates and college students Tracy Paules and Manuel Taboada. Again, Rolling broke into the apartment by prying open the double-glass sliding door with the same screwdriver he used to enter Ms. Hoyt's apartment. Armed with the same pistol and knife, Rolling crept into one of the bedrooms where he found Manny Taboada asleep. Rolling attacked Taboada, stabbing him in the solar plexus and penetrating his thoracic vertebra. Taboada was awakened by the blow and struggled to fight off his assailant. Rolling repeatedly stabbed him on the arms, hands, chest, legs and face and eventually killed him.
Hearing the commotion caused by the struggle, Tracy Paules approached Taboada's bedroom and, catching a glimpse of Rolling, fled to her room where she attempted to lock her door. Rolling, who was covered with Taboada's blood, followed Ms. Paules and broke through her bedroom door. Rolling subdued her, taped her mouth and her hands, and cut or tore off her t-shirt. He sexually battered her and threatened her with his knife before turning her over on the bed and killing her with three stabbing blows to her back. Finally, Rolling cleaned and posed the body of Tracy Paules and left the apartment.

PROCEDURAL POSTURE
This case originated in the Eighth Judicial Circuit Court in and for Alachua County. On November 15, 1991, the grand jury of Alachua County indicted appellant, Danny Rolling, for these serial murders. He was charged with five counts of first-degree murder, three counts of sexual battery, and three counts of armed burglary of a dwelling with a battery. On June 9, 1992, Rolling entered a plea of not guilty on all counts. Subsequently, on February 15, 1994, the day set for trial, Rolling changed his plea to guilty on all counts. The trial court accepted Rolling's plea after reviewing with him the factual basis for it and adjudicated him guilty on all counts.
A penalty phase proceeding was held, and the jury recommended that Rolling be sentenced to death for each murder by a vote of twelve to zero. The trial court followed the jury's advisory recommendation and sentenced Rolling to death for each homicide, *283 finding four aggravating circumstances applicable to each homicide: (1) Rolling had been previously convicted of a violent felony; (2) each murder was cold, calculated, and premeditated; (3) each murder was heinous, atrocious, or cruel; (4) each murder was committed while Rolling was engaged in the commission of a burglary or sexual battery. The trial court found as statutory mitigating factors that (1) Rolling had the emotional age of a fifteen-year-old; and (2) Rolling committed the crimes while under the influence of extreme mental or emotional disturbance. As for nonstatutory mitigators, the trial court found: (1) Rolling came from a dysfunctional family where he suffered physical and mental abuse during his childhood, and this background contributed to his mental condition at the time of the offenses; (2) Rolling cooperated with law enforcement officers by confessing and entering a guilty plea on all counts, thereby saving the criminal justice system time and expense; (3) Rolling felt remorse for his actions; (4) Rolling's family has a history of mental illness; and (5) Rolling's ability to conform his conduct to the requirements of law was impaired because of his mental illness.[1]
Rolling raises six claims of error on appeal: (1) the trial court abused its discretion in denying his motion for a change of venue and thereby violated his Sixth Amendment right to be fairly tried by an impartial jury because pervasive and prejudicial pretrial publicity so infected the Gainesville and Alachua County community that seating an impartial jury there was patently impossible; (2) the trial court erred in denying Rolling's motion to suppress his statements which were obtained in violation of his Sixth Amendment right to counsel; (3) the trial court erred in denying Rolling's motion to sever and conduct three separate sentencing proceedings; (4) the trial court erred in denying Rolling's motion to suppress physical evidence seized from his tent because the warrantless search and seizure violated his reasonable expectation of privacy under the Fourth Amendment; (5) the trial court erred in finding as an aggravating circumstance that the homicide of Sonya Larson was especially heinous, atrocious, or cruel; and finally (6) the trial court erred by giving an invalid and unconstitutional jury instruction on the heinous, atrocious, or cruel aggravating circumstance. We now address each issue in turn.

CHANGE OF VENUE
Rolling and his defense counsel made a deliberate and strategic choice not to file a motion for a change of venue at any time during the three years Rolling awaited trial for these offenses because they believed he could be fairly tried by an impartial jury in Gainesville. Instead, contrary to the dictate of Florida Rule of Criminal Procedure 3.240(c), which requires that a change of venue motion be filed no less than ten days before trial,[2] Rolling waited until the sixth day of jury selection to request a change of venue for the first time, when defense counsel admitted to the court: "I have to swallow my pride and admit that I was incorrect in my original opinion that this case could be fairly tried here."[3] The trial court subsequently denied the motion after a hearing.
Rolling now argues on appeal that the trial court erred in denying his motion for a change of venue because the record shows the pretrial publicity in this case during the three and a half years between the time the murders occurred in August 1990 and Rolling's guilty plea in February 1994 was so pervasive and prejudicial that this Court must presume as a matter of law that the venire, as well as the actual members of the jury, were biased against him. Rolling points also to the responses of certain prospective and actual jurors during voir dire as *284 further evidence that the entire Gainesville and Alachua County community had been victimized by Rolling's crimes and harbored an inherent prejudice and animosity against him.
To the contrary, the State, while candidly acknowledging that this case generated massive pretrial publicity, maintains that the three and one-half years between the crimes and the trial served to distance the community from most of the media coverage surrounding Rolling's case, and, even assuming otherwise, the publicity was not presumptively prejudicial because it consisted of "straight news stories," relating "cold, hard facts." Moreover, the State contends that "[b]eyond a doubt the trial court undertook extraordinary measures to ensure jurors who sat were fair and impartial," and "all jurors who served affirmatively and unequivocally stated that they could put aside any prior knowledge and decide the case based solely on the evidence presented at trial." Upon thorough review of the record in this case, we agree with the State.[4]
It is a well-settled principle under our caselaw that a criminal trial may be held in a county other than that designated by the constitution or by statute if prejudice in the proper county makes it impossible for a defendant, like Danny Rolling, to secure a fair trial by an impartial jury there. Such prejudice may warrant a change of venue when widespread public knowledge of the case in the proper county causes prospective jurors there to judge the defendant with great disfavor because of his character or the nature of the alleged offense. When this occurs, the defendant's right, under the United States and Florida Constitutions, to a fair trial by an impartial jury is protected by moving the trial from the proper, but partial county, to an impartial one. Manning v. State, 378 So.2d 274, 276 (Fla.1979)
In McCaskill v. State, 344 So.2d 1276 (Fla. 1977), we set out the test for determining whether a change of venue is required because of prejudice in the proper county:
The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
Id. at 1278 (quoting Kelley v. State, 212 So.2d 27, 28 (Fla. 2d DCA 1968)).
The trial court in its discretion must determine whether a defendant has *285 raised such a presumption of prejudice under this standard. Manning, 378 So.2d at 276. On appeal, however, the appellate court has "the duty to make an independent evaluation of the circumstances." Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). In exercising its discretion, a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).
Of course, as the trial court properly noted in its order here, pretrial publicity is normal and expected in certain kinds of cases, like this one, and that fact standing alone will not require a change of venue. Provenzano, 497 So.2d at 1182. Rather, in evaluating the nature and effect of any pretrial publicity on the knowledge and impartiality of prospective jurors, the trial court must consider numerous factors, such as: (1) the length of time that has passed from the crime to the trial and when, within this time, the publicity occurred, Oats v. State, 446 So.2d 90, 93 (Fla.1984); (2) whether the publicity consisted of straight, factual news stories or inflammatory stories, Provenzano, 497 So.2d at 1182; (3) whether the news stories consisted of the police or prosecutor's version of the offense to the exclusion of the defendant's version, Manning, 378 So.2d at 275; (4) the size of the community in question, Copeland v. State, 457 So.2d 1012, 1017 (Fla.1984); and (5) whether the defendant exhausted all of his peremptory challenges. Hoy v. State, 353 So.2d 826 (Fla.1977), cert. denied, 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).
The second prong of the analysis requires the trial court to examine the extent of difficulty in actually selecting an impartial jury at voir dire. If voir dire shows that it is impossible to select jurors who will decide the case on the basis of the evidence, rather than the jurors' extrinsic knowledge, then a change of venue is required. Copeland, 457 So.2d at 1017. The ability to seat an impartial jury in a high-profile case may be demonstrated by either a lack of extrinsic knowledge among members of the venire or, assuming such knowledge, a lack of partiality. Oats, 446 So.2d at 93.
To be qualified, jurors need not be totally ignorant of the facts of the case nor do they need to be free from any preconceived notion at all:
To hold that the mere existence of any preconceived notion as to the guilt of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961). Thus, if prospective jurors can assure the court during voir dire that they are impartial despite their extrinsic knowledge, they are qualified to serve on the jury, and a change of venue is not necessary. Davis, 461 So.2d at 69. Although such assurances are not dispositive, they support the presumption of a jury's impartiality. Copeland, 457 So.2d at 1017.
In some instances, the percentage of prospective jurors professing an extrinsic knowledge of the case or a fixed opinion has been used to determine whether pervasive community prejudice exists. However, even where a substantial number of prospective jurors admit a fixed opinion, community prejudice need not be presumed. For instance, in Murphy, the United States Supreme Court evaluated these percentages as follows:
In the present case, by contrast, 20 of 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.
421 U.S. at 803, 95 S.Ct. at 2037-38 (footnote omitted). Consistent with the Murphy rationale, courts of this state have found in other cases, where similar percentages of prospective jurors voiced a bias during voir dire, that a change of venue was not required because *286 the partiality of certain individual venire members did not reflect a pervasive prejudice infecting the entire community. See Provenzano; Copeland; see also Pitts v. State, 307 So.2d 473 (Fla. 1st DCA 1975).
In this case, the trial court's order, which we find to be supported by the record, details the meticulous jury selection and screening process which it employed in an effort to ultimately seat a jury able to impartially recommend an appropriate sentence. Here, the court individually reviewed each of the 1233 responses filed by prospective jurors and, prior to voir dire, summarily excused over 800 of those summoned because they were either exempt or legally ineligible to serve or otherwise demonstrated some "hardship" requiring excusal. The trial court, in its own words, used a "strict standard of acceptance ... in determining which jurors should be retained" and "excused those who claimed to have a state of mind that would render them unable to be impartial either to the State or the Defendant."
Moreover, panels of twenty to twenty-four prospective jurors were questioned in two phases. The first round of questioning focused on attitudes regarding the death penalty and exposure to pretrial publicity. The second round of questioning addressed all other matters. Prospective jurors heard only the responses of others placed on the same panel, and did not observe the questioning and responses of other panels. In both phases, prospective jurors were reminded that they could respond to the questions privately to the court and counsel outside the presence of other panel members. The record reflects that throughout the process, the trial court gave the attorneys wide latitude in questioning prospective jurors. The court also liberally granted Rolling's challenges for cause, often over the State's objection, and allotted Rolling six additional peremptory challenges after he exhausted his initial twenty.
Finally, the trial court analyzed the pretrial publicity in this case as follows:
Another factor to be viewed by the Court in a case with this degree of pretrial publicity is the nature of the publicity itself. Publicity, in and of itself, is not sufficient grounds for change of venue. The publicity must be hostile publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). An analysis of the publicity given this case by the local media shows that, while the media has kept the public apprised of all court procedures which have not been held in camera, the approach of the local media has been objective, not directed toward inflaming the citizens or suggesting to them the penalty that ought to be imposed in this case. The most inflammatory item of pretrial publicity was that written, not by a journalist local to the area, but by a columnist for the Miami Herald. Indeed, in a story involving one of the interviews conducted out of state, the lead to the story indicated that the evidence from the interviewee might well support the Defendant's position with respect to the penalty that should be imposed. The tenor of the presentation was that the interview showed that there may be evidence supporting the mitigating factors which the defense might raise. To further protect the Defendant from hostile pretrial publicity, photographs of the victims and the crime scenes were not released to the public, and have not been published. Some of the pretrial publicity was favorable to the position of the Defendant, rather than hostile to the Defendant. There was one significant issue, not hostile to the Defendant, but opposing the imposition of the death penalty. A number of local ministers had written publicly, urging the State Attorney to offer the Defendant the opportunity to plead to the offenses in return for sentences to life imprisonment. They presented various reasons for their position, including a general opposition to the death penalty itself, the fiscal savings which would result from entry of a plea of guilty, and the like. The Gainesville Sun published responses from readers reacting to the letter. In the publication, the responses were presented effectively on both sides of the issue.
The trial court then found that the publicity, although pervasive, was not so hostile as to inflame the community in general and further found that the pretrial publicity did not *287 so prejudice prospective jurors that they could not evaluate impartially those factors which were to be evaluated in determining the penalty to be imposed in a capital case.
As to the first prong of our analysis, it is undisputed that the brutal slaying of five young students deeply affected the college community of Gainesville, Florida and generated overwhelming local and national media attention. While the amount of media coverage in this case makes it unique, the extent of publicity it received was certainly not surprising or unwarranted given the circumstances of this case. Indeed, in light of the fact that Rolling chose not to request a change of venue pretrial, it appears that even he was not concerned or otherwise disturbed by the extent or nature of the coverage at any time during the three years he awaited trial.
Likewise, the trial court's order denying Rolling's request for a change of venue reflects a candid and legally grounded review of the media attention this case received. Because we find the trial court's evaluation of the media coverage in this case to be consistent with our own review of the record, we reject Rolling's claim that the pretrial publicity presumptively prejudiced the entire Alachua County community against him.
We also find unpersuasive Rolling's related assertion that the responses of both prospective and actual jurors during voir dire further demonstrated a real, community-wide prejudice and animosity toward him. Not surprisingly, of course, every member of the venire had some extrinsic knowledge of the facts and circumstances surrounding this case. Also as expected, the responses of certain prospective jurors showed that their knowledge of the case prevented them from sitting impartially on the jury. Nevertheless, the animus toward Rolling expressed by these individuals reflected nothing more than their own personal beliefs or opinions. Contrary to Rolling's assertions, we find no reason to believe that certain prospective jurors who voiced a bias against Rollingnone of whom sat on Rolling's jurysomehow spoke for the entire Alachua County community.
We also must reject Rolling's claim that the responses of actual jurors demonstrated a community-wide bias against him because we find it to be completely contrary to the evidence in the record. Rolling never challenged for cause any member of his actual jury based on bias or any other grounds; and the trial court found credible the assurances of every member of Rolling's jury that they could lay aside their extrinsic knowledge of the case and recommend a penalty based only upon the evidence presented in court.
As to the second prong of our analysis, we must determine whether any difficulty encountered in selecting a jury in this case reflected a pervasive community bias against Rolling which so infected the jury selection process that it was impossible to seat an impartial jury in Alachua County. Jury selection in this case was no small task. In fact, the process spanned a three-week period. Nevertheless, we do not believe the sheer length of this selection process indicates that impartial jurors could not be found. Rather, the amount of time it took to select a jury was largely attributable to the trial court's extensive and deliberate efforts to ensure that the jurors selected were, without a doubt, impartial and unbiased.
After meticulously culling the initial pool down to those venire members who were not obviously biased or otherwise ineligible to serve, the trial court allowed the parties wide latitude in questioning prospective jurors so that open animosity, as well as more subtle, unconscious prejudices, could be detected. When the responses of prospective jurors raised even the slightest concern that they perhaps could not sit impartially, the court liberally granted Rolling's challenges for causeresolving even questionable cases in favor of the defendant. In addition, the court gave Rolling six additional peremptory challenges as a further safeguard to ensure juror impartiality.[5] *288 Once again, critical to the issue here is that the trial court found credible the assurances of all the members of Rolling's jury that they could lay aside their extrinsic knowledge of the case and recommend a penalty based only upon the evidence presented in court; and Rolling never challenged for cause any member of his actual jury based on bias or any other grounds. Rather than revealing a pervasive community bias against him as Rolling suggests, the intricate jury selection process employed in this case and the responses of actual jurors during questioning shows that it was possible to seat an impartial jury in Alachua County. In this regard, we must commend the trial court for employing a jury selection process with ample safeguards. Consequently, because we find that the trial court's system was an effective one which produced an impartial jury, we affirm the trial court's denial of Rolling's motion for a change of venue. Neither the pretrial publicity in this case nor the lengthy jury selection process evidenced a community bias so pervasive as to make it impossible, under any circumstances, to seat an impartial jury in Gainesville.

SUPPRESSION OF CONFESSIONS
Next, Rolling claims the trial court erred in denying his pretrial motion to suppress statements he made to Gainesville Homicide Task Force investigators on January 18, 1993, January 31, 1993, and February 4, 1993, and all other written and oral statements to a fellow inmate, Bobby Lewis.
These statements were admitted against him at his penalty phase proceeding.
On appeal, Rolling challenges the trial court's findings that (1) his statements to Lewis and law enforcement officers did not violate his right to counsel because Lewis was not acting as a de facto state agent and, (2) that the assistant state attorney's involvement in the interrogations was not unethical and did not warrant suppression of Rolling's statements.[6] Specifically, Rolling maintains that law enforcement officers and prison officials knowingly exploited the relationship between himself and fellow inmate Bobby Lewis such that Lewis was acting as a de facto government agent when he elicited inculpatory statements from Rolling. Consequently, he argues, the statements were inadmissible at his sentencing trial pursuant to Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Alternatively, Rolling asserts that his statements must be suppressed because the Homicide Task Force, which interviewed Rolling in January and February of 1993, served as the alter ego of assistant state attorney Jim Nilon, whose authorization and orchestration of the interrogations without notifying Rolling's defense counsel prior to the meetings constituted a serious breach of ethics in violation of the Rules Regulating the Florida Bar 4-4.2 and 4-5.3.[7]
*289 Bobby Lewis befriended Rolling shortly after Rolling arrived at Florida State Prison to await trial for the Gainesville homicides. During this time, Rolling made several statements to Lewis alluding to his involvement in the homicides. Armed with this information, Lewis believed he could benefit financially by (1) selling this information to Sondra London, Rolling's fiance and biographer or, (2) obtaining his freedom or a reduced sentence by becoming a prosecution witness against Rolling. Lewis's attorney, Mr. Link, contacted the State Attorney on Lewis's behalf to determine whether Lewis could obtain a deal from the State in exchange for Rolling's statements and information about the student murders. Lewis was informed, through his attorney, that the State would not enter into any kind of agreement with Lewis for information he might have about Rolling or the murders.
On several occasions between July 1992 and December 1992, Task Force investigators spoke with Lewis, who initiated each meeting, but continually refused Lewis's requests to receive some kind of benefit or inducement for the information he claimed to have about the homicides. Nevertheless, Lewis remained steadfast in his belief that he could benefit personally from Rolling's statements. When Rolling returned to FSP in December 1992 after spending six months in the mental health facility at Chattahoochee, Lewis continued to tap Rolling for information about the Gainesville murders while they were together in "general population" and after they individually were moved into the "protective management" program at the prison pursuant to independent requests by each of them to be placed there because of safety concerns. During this time, Rolling decided that he wanted to assist Lewis in his plan to strike a deal or receive some benefit from the State for the statements Rolling had made to him about the homicides. In an effort to enhance Lewis's bargaining position with the State, Rolling made Lewis his "confessor"instructing Lewis to write out in his own handwriting each of Rolling's written statements about the homicides and then return the originals to Rolling to be destroyed.
On January 17, 1993, Lewis advised prison officials that Rolling desired to talk with Task Force investigators about the Gainesville murders. After verifying with Rolling directly that he wished to speak with law enforcement officers, Task Force investigators went to FSP to interview Rolling on the next day, January 18. Before the interview, investigators made it clear to Rolling that they could not and would not meet Rolling's conditions for the interviewone of which was Lewis' release for his assistance in obtaining Rolling's statements about the crimesand also reminded Rolling that he had invoked his right to counsel and his lawyer "would not be happy" if he spoke with them. At this point, discussions concerning the format for the interview itself broke down and investigators did not talk with Rolling about the homicides on January 18.
In the days following the aborted interview, Lewis initiated numerous contacts with prison authorities to further discuss the possibility of making a deal with the State in exchange for testimony or information about statements Rolling allegedly had made to him. Prison authorities forwarded the information to the Homicide Task Force, which responded with a letter to prison authorities instructing them to (1) merely listen to Lewis and refrain from instructing him in any way; (2) refrain from initiating any contact with Lewis or Rolling; (3) treat any request by Lewis or Rolling as they would a request from any other inmate; and (4) tape record any meetings initiated by Lewis.
Shortly thereafter, Rolling advised prison authorities that he again wished to talk with officers investigating the student murders. Prior to interviewing Rolling about the homicides on January 31, 1993, Task Force investigators discussed with him at great length the format for the interview. It was agreed that Lewis could serve as Rolling's "mouthpiece" during the interview, and Rolling would verify the accuracy of each of Lewis's statements. Moreover, investigators reminded Rolling that he had invoked his right to counsel and reiterated to both Rolling and Lewis once again that they could not promise Lewis any type of benefit for the information Rolling might relatethrough Lewisabout *290 the homicides. Rolling and Lewis agreed to the format for the interview and Rolling confirmed that he wanted to waive his right to counsel and talk to investigators without his attorney. Rolling's subsequent statement to Task Force investigators on January 31, made after a valid waiver of his right to counsel, was audiotaped; and the February 4 statement, also preceded by a valid waiver, was videotaped. Bobby Lewis served as Rolling's "mouthpiece" and Rolling confirmed the accuracy of Lewis's statements during these interviews.
In Massiah, the United States Supreme Court announced for the first time that the Sixth Amendment prohibits law enforcement officers from interrogating a defendant after his or her indictment and in the absence of counsel.[8] Consequently, statements "deliberately elicited" from a defendant after the right to counsel has attached and in the absence of a valid waiver are rendered inadmissible and cannot be used against the defendant at trial. 377 U.S. at 206, 84 S.Ct. at 1203. Nevertheless, incriminatory statements by a defendant will not be excluded merely because the statements are made after judicial proceedings have been initiated and in the absence of a valid waiver. Rather, law enforcement officials must do something that infringes upon the defendant's Sixth Amendment right.
While the "deliberately elicited" standard is clearly satisfied when the police directly interrogate or question a defendant in some fashion, it also may be satisfied by less direct types of questioning. See State v. Wooley, 482 So.2d 595, 596 (Fla. 4th DCA 1986). Usually, determining whether the "deliberately elicited" standard has been met becomes an issue in cases, like this one, where incriminatory statements from a defendant were obtained through persons other than the police who allegedly acted as police informants or surrogates. In Massiah, for instance, the Court found that the state violated the defendant's right to counsel where police officers concealed a radio transmitter on a codefendant's person, arranged for the codefendant to meet the defendant in the codefendant's car to discuss their pending case, and then listened to conversations incriminating the defendant via the transmitter. 377 U.S. at 206, 84 S.Ct. at 1203.
Similarly, in United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court concluded that police conduct met the "deliberately elicited" standard where law enforcement officers contacted a paid informant in jail with the defendant and advised the informant to be alert to any statements made by federal prisoners, but not to initiate any conversations or question the defendant regarding his offense. Id. at 274, 100 S.Ct. at 2189; but see Kuhlmann v. Wilson, 477 U.S. 436, 455, 106 S.Ct. 2616, 2628, 91 L.Ed.2d 364 (1986) (concluding that defendant's right to counsel not violated under Henry where police placed informant in defendant's cell because informant obeyed instructions not to question defendant, but merely to listen for information). Consistent with its decisions in Massiah and Henry, the Court found in Moulton that, even though it was the defendant who initiated the meeting, the defendant's right to counsel nonetheless was violated where an undercover codefendant met with the defendant and actively obtained *291 incriminating statements from him. 474 U.S. at 176-77, 106 S.Ct. at 487.
On the whole, these cases demonstrate that the culpability of law enforcement is dependent upon the extent of their role in securing the confession indirectly. That is, a violation of a defendant's right to counsel turns on whether the confession was obtained through the active efforts of law enforcement or whether it came to them passively. In Moulton, the Court emphasized that "passivity on the part of law enforcement" is the critical factor in this analysis:
[A] knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.
Id. at 176, 106 S.Ct. at 487.
Florida courts also have focused on the role of law enforcement officers in determining whether a confession was obtained in violation of the defendant's right to counsel. For instance, in Sikes v. State, 313 So.2d 436 (Fla. 2d DCA 1975), the district court held that voluntary statements made to prison authorities by an incarcerated defendant are not subject to the Massiah rule, concluding, "We cannot expect prison guards to wear earplugs at all times while in the performance of their duties." Id. at 437. Likewise, in Muehleman v. State, 503 So.2d 310 (Fla.), cert. denied, 484 U.S. 882, 108 S.Ct. 39, 98 L.Ed.2d 170 (1987), we interpreted the "deliberately elicited" standard in terms of its plain meaning and found that the defendant's right to counsel had not been violated because his statements were not a product of a "stratagem deliberately designed to elicit an incriminating statement." Id. at 314 (quoting Miller v. State, 415 So.2d 1262, 1263 (Fla.1982)). See also Malone v. State, 390 So.2d 338, 339-40 (Fla.1980).
We turn now to the trial court's order denying Rolling's motion to suppress statements made to Bobby Lewis and law enforcement officers.[9] A trial court's ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. McNamara v. State, 357 So.2d 410, 412 (Fla.1978).
The record supports the trial court's description of Lewis's persistent attempts to strike a deal with the State even in the face of numerous responses from the State that no deal would be forthcoming. The record also supports the trial court's conclusion that prison officials did not house Rolling and Lewis in close proximity to each other or grant Lewis privileges as a trustee in order to facilitate or encourage Lewis in his efforts to gain information from Rolling about the homicides. Rather, we find that prison officials acted in accordance with Department of Corrections policy and guidelines when they granted the independent requests of Rolling and Lewis to be placed in the "protective management" program.
Finally, we find that the record and relevant caselaw clearly support the trial court's conclusion that Rolling's right to counsel was not violated because Bobby Lewis was not acting as a government agent when he elicited incriminatory statements from Rolling or served as Rolling's "mouthpiece" during the January 31 and February 4 interviews with Task Force investigators. As the trial court explained:
For the State to have violated a defendant's Right to Counsel, the State must have taken some affirmative steps toward obtaining information in derogation of that right. Whether it be as blatant as the use of paid informant under a contingency agreement (Henry), or merely the intentional placing of an inmate in a certain location in order that the inmate may elicit conversations from a defendant, there must be some state action directed to obtaining statements of a defendant in the absence of his counsel. As pointed out *292 above, the Defendant herein has failed to establish that there was any such state action. Lewis was at no time an agent of the State, nor was the state involvement such that Lewis's actions with respect to the Defendant are in any way attributable to the State.
The repeated interactions between law enforcement and prison officials and Bobby Lewis were necessitated solely by Lewis's refusal to take no for an answer and his own opportunistic strategy to somehow benefit from the relationship he cultivated with Rolling. Thus, we find that Rolling's incriminatory statements to Lewis and the officers were in no way the product of "the State's stratagem deliberately designed to elicit an incriminating statement" from him. Malone, 390 So.2d at 339. Accordingly, we affirm the trial court's denial of Rolling's motion to suppress on this ground.
Finally, we also find the trial court properly denied Rolling's further claim that unethical conduct on the part of the state attorney warranted suppression of his statements. The trial court concluded:
As legal advisor to the law enforcement officers, he [Nilon] made himself available to render such advice as was appropriate under the circumstances. Mr. Nilon was careful to insure that he did not participate in any of the interviews with the Defendant, but was available to advise law enforcement officers should such advice be sought. The fact that Mr. Nilon was in geographic proximity to the site of the interview, rather than merely being available to render advice by telephone, does not rise to the level of violation of the Code of Professional Responsibility.
The record confirms, and Rolling does not argue to the contrary, that the prosecutor did not actually participate in the interrogations. By making himself available at FSP to investigators, with whom Rolling himself requested the meetings, Mr. Nilon was there to ensure that Rolling's constitutional rights were not violated by any conduct of Task Force investigators who, unlike Mr. Nilon, were not lawyers or otherwise professionally trained in the law. Because the evidence in the record and inferences derived therefrom support the trial court's finding that the prosecutor's presence at the prison to render advice if needed did not violate the Rules of Professional Conduct, we affirm the trial court's denial of Rolling's motion to suppress on this ground as well. See McNamara.

SEARCH AND SEIZURE
As his third claim of error, Rolling contends that the trial court erred in denying his pretrial motion to suppress physical evidence seized from a totebag found inside a tent pitched in a wooded area owned by the University of Florida. Rolling argues that the warrantless search and seizure of these items violated his rights under article I, section 12 of the Florida Constitution and the Fourth Amendment of the United States Constitution.
Generally, the Fourth Amendment does safeguard against a warrantless entry into a person's home for purposes of a routine felony arrest. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).[10] Where exigent circumstances exist, *293 however, certain warrantless entries are permitted. Arango v. State, 411 So.2d 172 (Fla.), cert. denied, 457 U.S. 1140, 102 S.Ct. 2973, 73 L.Ed.2d 1360 (1982). The kinds of exigencies or emergencies that may support a warrantless entry include those related to the safety of persons or property, see Richardson v. State, 247 So.2d 296 (Fla.1971), as well as the safety of police. Jones v. State, 440 So.2d 570 (Fla.1983). Of course, a key ingredient of the exigency requirement is that the police lack time to secure a search warrant. Police may not enter and search for dangerous instrumentalities or other evidence, even if they have probable cause to believe it is on the premises or otherwise subject to removal or destruction, if they have time to obtain a warrant and then enter under that authority. Jennings v. State, 419 So.2d 750 (Fla. 2d DCA 1982); Graham v. State, 406 So.2d 503 (Fla. 3d DCA 1981). Moreover, an entry based on an exigency must be limited in scope to its purpose. Thus, an officer may not continue her search once she has determined that no exigency exists. Anderson v. State, 665 So.2d 281 (Fla. 5th DCA 1995).
The record reflects that Rolling was living in a tent pitched in a fenced, wooded area owned by the University of Florida when Deputy Merrill saw Rolling and a black male companion enter the woods through the fence gate at 1 a.m. on August 28, 1990, and called for back-up. There were an unusually large number of officers patrolling the area that night and early morning because of the discovery of three murder victims and recent bank robberies that remained unsolved. The officers followed Rolling and his cohort into the woods and, when within shouting distance, announced their presence. The black male, Tony Danzy, turned back to the officers but Rolling fled into the woods. Deputy Liddell chased Rolling off the path into denser woods but was unable to apprehend him. However, a canine tracking unit called to the area led police to Rolling's campsite. As the officers approached the campsite, they found a raincoat and dye-stained money on the ground. Knowing that the bank across the street had been robbed the preceding day and the white male robber had been armed, the officers decided to secure the tent. After a search dog entered the tent and came out, Deputy Liddell followed department procedure and lifted the flaps of the tent to confirm it was empty. While doing so, he observed a tote bag sitting on top of more red-stained money. Fearing that the fleeing suspect may have returned to the tent for a gun, and concerned about the safety of officers at the scene, Liddell searched the bag for a weapon and found a gun box. He opened the box and discovered a blue steel Taurus handgun. He then called for a crime scene unit.
Crime scene investigators arrived at the campsite at approximately 1:30 a.m. and collected various items from the campsite and tent, including the tote bag with the weapon. Six days later, on September 4, 1990, investigator Jack Smith inventoried the contents of the tote bag and found a screwdriver, duct tape and a dark ski mask. These items of evidence were turned over to the Florida Department of Law Enforcement and later admitted into evidence against Rolling at his sentencing trial.
Rolling argues that the trial court erred in denying his motion to suppress because officers were not justified in conducting a warrantless search of the interior of his tent. Rolling contends that once the dog entered the tent and found it empty, all exigencies dissipated. Any additional examination of the tent's interior was nugatory in terms of officer safety, and even if there was a weapon in the tent, the officers could not be assured that the suspect in the woods was armed. Furthermore, because the campsite area was secured after the initial search of the tent and totebag until the crime scene unit arrived, it certainly could have remained secured until a warrant was obtained for a further search and seizure. Because officers were not acting pursuant to a warrant or a recognized exception to the warrant requirement, *294 Rolling maintains the search and seizure of the tent and bag were unlawful. See Jones v. State, 648 So.2d 669 (Fla.1994). Moreover, the purported "inventory" search of the tote bag six days later was also unlawful, he argues. Consequently, Rolling contends that the physical evidence recovered from his totebag was improperly admitted against him at his sentencing trial and therefore he is entitled to a new sentencing proceeding.
In its order denying Rolling's motion to suppress the physical evidence recovered from the totebag in his tent, the trial court first found that even though Rolling was a trespasser on university land, he had standing to challenge the search and seizure of items from his tent because he had a proprietary interest in the tent itself. The trial court further concluded, however, that the warrantless search and seizure of the physical evidence at issue here was reasonable in light of the exigent circumstances. The officers' legitimate concern for their safety from an unapprehended individual who might be armed in the dark, heavily wooded area around the campsite "excused the officers from the requirement of obtaining a warrant."
At the suppression hearing, Deputy Liddell testified that he initially searched the tote bag for weapons because he was concerned for officer safety. Additionally, he remained near the tent with the gun secured while waiting for the crime scene unit to arrive because of his continuing concern that the suspect might return to the tent to retrieve the weapon or still remain in the area armed with other weapons. Contrary to Rolling's assertions, these exigent circumstances, i.e., the danger to police, which justified Deputy Liddell's initial warrantless search of the tote bag for weapons, remained even after the crime scene unit arrived at the campsite. Thus, we find that the trial court's conclusion that the warrantless search of Rolling's tent and totebag was justified by exigent circumstances, i.e., danger to police, is supported by the record.
Furthermore, although the trial court's order does not expressly address the propriety of Investigator Smith's search of the contents of the totebag six days later, we find that it was a valid inventory search. An inventory search is a Fourth Amendment search and seizure, Elson v. State, 337 So.2d 959 (Fla.1976), but is unique in that its purposes are for the protection of property and persons rather than to investigate criminal activity. Miller v. State, 403 So.2d 1307 (Fla. 1981). Contraband or evidence seized in a valid inventory search is admissible because the procedure is a recognized exception to the warrant requirement. Caplan v. State, 531 So.2d 88 (Fla.1988). The nature of this exception, however, is determined by the nature of the intrusion.
In South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the United States Supreme Court discussed the protective, noncriminal basis of this particular intrusion and pointed out that the probable cause standard and the warrant requirement are not relevant to an inventory search analysis. The test is solely one of "reasonableness." The reasonableness of a purported inventory search is dependent upon it being a true good-faith inventory search and not a subterfuge for a criminal, investigatory search. If the search is not, in fact, an inventory search, then it must be justified on some other basis. Fields v. State, 369 So.2d 603 (Fla. 1st DCA 1978).
Investigator Smith testified at the suppression hearing that his search of September 4, in which he itemized the contents of the totebag and cataloged the serial numbers on the red-stained money recovered from the campsite, was a "routine inventory" pursuant to his investigation of the bank robbery which occurred the night before police found Rolling's campsite. Because we find that Smith's inventory of the contents of the totebag meets the Opperman standard and was reasonable in light of the circumstances of this case, we affirm the trial court's denial of Rolling's motion to suppress physical evidence recovered from his tent and totebag.

SEVERANCE
Rolling asserts that the trial court improperly joined these cases under Florida Rule of *295 Criminal Procedure 3.150(a) for purposes of his sentencing trial. Consequently, he urges us to vacate his sentences, sever the three cases and remand for a fair determination of his sentence in three separate penalty proceedings.
The record reflects that Rolling killed Larson and Powell in their apartment on Friday, August 24 at approximately 3 a.m. About forty-two hours later, in an apartment two miles away, Christa Hoyt was murdered on Saturday, August 25 at around 11 a.m. Finally, on Monday, August 27, at around 3 a.m., Rolling killed Taboada and Paules in their apartment located in a complex about one mile from each of the first two crime scenes. Thus, within a seventy-two hour period, Rolling had stabbed to death five college students in their apartments, sexually battering three of his victims before killing them.
Initially, Rolling's pretrial motion to sever was made solely on grounds that "[a] severance is necessary to promote a fair determination of the defendant's guilt or innocence as to each count in the indictment." Rolling did not argue pretrial that a severance was also warranted, should a penalty phase trial become necessary, in order to fairly determine the appropriate sentences for these crimes. Florida Rule of Criminal Procedure 3.150 states in pertinent part:
(a) Joinder of Offenses. Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses ... are based on the same act or transaction or on 2 or more connected acts or transactions.
Relying on our decisions in Bundy v. State, 455 So.2d 330 (Fla.1984), Wright v. State, 586 So.2d 1024 (Fla.1991), Fotopoulos v. State, 608 So.2d 784 (Fla.1992), Crossley v. State, 596 So.2d 447 (Fla.1992), and Ellis v. State, 622 So.2d 991 (Fla.1993), the trial court concluded that the instant offenses were connected by temporal and geographical association, the nature of the crimes, and the manner in which they were committed. The court explained:
From a review of those cases, the [Florida Supreme] Court discerns several rules to be applied to determine whether or not offenses are `connected' for purposes of the rules of joinder. First, the Court found that `for a joinder to be appropriate the crimes in question must be linked in some significant way.' Ellis, at [1000]. Two recognized `links' were mentioned by the Court in its opinion: the fact that one crime is causally related to the other, and the fact that the crimes occurred "during a `spree' interrupted by no significant period of respite." Id. The Court then added that the general temporal and geographical proximity is not, in and of itself, a link, but is considered insofar as it "helps prove a proper and significant link between the crimes." Citing Crossley.

In this case, based on the testimony present at the hearing, the [trial] [c]ourt finds no causal link between the offenses in the sense that one offense was used to induce someone to commit another. Fotopoulos. The [c]ourt finds, however, that the offenses charged at the three crime scenes are linked by a temporal continuity, not merely a temporal proximity. Temporal continuity is one of the `significant links' recognized by the Supreme Court in Ellis as found in Bundyalthough by a different name. The [c]ourt noted that the offenses in Bundy occurred "during a `spree' interrupted by no significant period of respite." It is apparent from the context and from the reference to "respite" that the word, "spree," was meant to refer to a temporal continuity. From the factual information provided to the court at the hearing, the [c]ourt finds that the events were so linked as to constitute a single prolonged episode during which the deaths of five persons were effected.
Prior to jury selection, Rolling orally objected to the joinder of the three crime scenes for penalty phase purposes on grounds that a severance was necessary to prevent a "carryover effect" of aggravating factors applicable to one crime scene from influencing the evaluation of aggravating factors applicable to another crime scene. After hearing arguments from the parties, the trial court denied this motion also in light of *296 the fact that the statutory aggravators, as well as all of the mitigating evidence, would apply to all three of the crime scenes; and the jury would be given specific instructions as to the death of each victim and an opportunity to render five separate sentencing recommendations. Because the record and relevant caselaw support the trial court's findings that these murders were properly joined under rule 3.150(a) for penalty phase purposes, we reject Rolling's severance claim as being without merit.

THE HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATOR
Rolling argues that the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance as to the murder of Sonya Larson because there was no evidence that Ms. Larson, who was attacked in her sleep, anticipated her death or otherwise endured "extreme pain or prolonged suffering." Elam v. State, 636 So.2d 1312 (Fla.1994).
The trial court's sentencing order states in pertinent part:
Sonya Larson was killed in her own bed by multiple stab wounds.... The attack was characterized by the medical examiner as a "blitz" attack after which the victim would have remained alive for a period from thirty to sixty seconds. Despite the relative shortness of the event, the fact that many of the wounds were characterized as defensive wounds indicates that the victim was awake and aware of what was occurring. During all this time, the victim's mouth was taped shut so that she could not cry out.
Contrary to Rolling's assertion that there was no evidence that Ms. Larson endured "prolonged suffering" or "anticipated her death," the record reflects the medical examiner testified that Ms. Larson sustained defensive wounds on her arms during Rolling's attack and was awake between thirty and sixty seconds before losing consciousness and dying. Moreover, Rolling's statement to police on January 31 is consistent with the medical examiner's testimony and the trial court's finding. Rolling told police he stabbed Ms. Larson and put duct tape over her mouth to muffle her cries. He explained that he continued to stab her as she fought and tried to fend off his blows.
Finally, as the State correctly notes, Rolling's guilty plea to this murder on February 15, 1994, is supported by a factual basis which also shows that Rolling muffled Ms. Larson's cries and that she sustained defensive wounds on her arms and left thigh.
Because the evidence in the record demonstrates that Ms. Larson was awake but disabled by the duct tape over her mouth while she struggled with her attacker, sustained several defensive wounds to her arms and leg, and did not die instantaneously, we find that the trial court properly found the heinous, atrocious, or cruel aggravator proved beyond a reasonable doubt. See Geralds v. State, 674 So.2d 96 (Fla.), cert.denied, ___ U.S. ____, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Merck v. State, 664 So.2d 939, 943 (Fla.1995); Garcia v. State, 644 So.2d 59, 63 (Fla.1994); Dudley v. State, 545 So.2d 857, 860 (Fla.1989).

JURY INSTRUCTION
Rolling argues that the trial court erred in giving an unconstitutionally vague jury instruction as to the heinous, atrocious, or cruel (HAC) aggravating factor. Here, the trial court gave the following HAC jury instruction:
The crime for which the Defendant is to be sentenced was especially heinous, atrocious or cruel. Heinous means especially wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
In order for you to find a first-degree murder was heinous, atrocious or cruel, you must find that it was accompanied by additional acts that showed that the crime was conscious [sic] or pitiless, and was unnecessarily torturous to the victim.
Events occurring after the victim dies or loses consciousness should not be considered by you to establish that this crime was especially heinous, atrocious, or cruel.
As the State correctly explains, the instant instruction, which is similar in all material *297 aspects to the instruction upheld by this Court in Hall v. State, 614 So.2d 473, 478 (Fla.1993), has been reaffirmed on numerous occasions. See Geralds v. State, 674 So.2d 96 (Fla.1996); Merck v. State, 664 So.2d 939, 943 (Fla.1995). Consequently, we reject Rolling's claim that the trial court's instruction to the jury on the HAC aggravator was unconstitutional. We find that the jury in Rolling's penalty phase trial received a specific instruction which fairly apprised the jurors of the definition of each term as well as the surrounding circumstances the State had to prove to support this aggravating factor.

PROPORTIONALITY
Finally, albeit not argued by Rolling on appeal, our review of the entire record in this case shows that death is the appropriate sentence for each of these brutal murders and is not disproportionate given the facts and circumstances of this case. See Robinson v. State, 610 So.2d 1288 (Fla.1992); Coleman v. State, 610 So.2d 1283 (Fla.1992); Henderson v. State, 463 So.2d 196 (Fla.1985); Bundy v. State, 455 So.2d 330 (Fla.1985); Francois v. State, 407 So.2d 885 (Fla.1981).
Accordingly, we affirm Rolling's sentences of death.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.
ANSTEAD, Judge, concurring in part and dissenting in part.
I cannot concur in the majority's conclusion that appellant was not entitled to a change of venue.
We have held that a change of venue is mandated when a record contains "evidence that a substantial number of the veniremen had lived in fear during a defendant's `reign of terror.'" See Thomas v. State, 374 So.2d 508, 516 (Fla.1979). If ever those words had meaning, they have meaning here. This case, consistent with the change of venue from Tallahassee to Miami in Bundy v. State, 455 So.2d 330 (Fla.1984), involving similar horrifying circumstances, should not have been tried in the same college community so deeply scarred by its crimes. We are only fooling ourselves, and closing our eyes to what is obvious to all, when we deny the magnitude and depth of the fear and loss sustained by the Gainesville community as reflected in this record. A justice system asks too much when it asks a community so deeply torn asunder to decide the fate of the person admittedly responsible for the unspeakable crimes at issue.
There is an obvious and substantial qualitative difference between the task facing the citizens of Gainesville compared to this case being tried anywhere else in Florida. While any community or group of potential jurors would have difficulty being objective in a case of this nature, the community actually violated has been affected in a way profoundly unique because of its relationship to the crimes and the victims. Sometimes we ask too much. I fear we have done so here.
NOTES
[1] The trial court concluded that Rolling's impairment "did not rise to the level of being substantial, and is therefore not a statutory mitigating factor." See § 921.141(6)(f), Fla.Stat. (1995).
[2] Florida Rule of Criminal Procedure 3.240(c) states in full:

A motion for change of venue shall be filed no less than 10 days before the time the case is called for trial unless good cause is shown for failure to file within such time.
[3] Apparently, the public defender believed that Rolling had a better chance of receiving a fair trial in Gainesville, a community known as a liberal college town, than anywhere else in the state. See Initial Brief of Appellant at 133.
[4] As a preliminary matter, the State contends that Rolling has, at least in part, waived any claim that the trial court erred in denying his motion for a change of venue because his motion was not timely. The State emphasizes that Rolling chose not to file a change of venue motion pretrial because he did not believe the pretrial publicitywhich was available to him and of which he was fully awareexisted in such a quantity as to deny him a fair trial in Alachua County. The State argues that because Rolling waited until the sixth day of voir dire to request a change of venue, the news articles and other documentation of community feelings prior to February 15, 1994, when Rolling pled guilty to these offenses, are no longer germane to the issue, and thus we cannot consider that evidence in determining whether the trial court properly denied Rolling's motion.

We agree that Rolling's deliberate strategy choice to proceed to trial in Gainesville despite the publicity indicates he did not believe it to be prejudicial at that time. We find, however, that Rolling's motion filed after the first phase of voir dire preserved his claim for review on appeal.
See Provenzano v. State, 497 So.2d 1177, 1183 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987) (finding defendant's oral motion for change of venue on first day of voir dire was timely and approving trial court's denial of motion only after parties began to impanel a jury); Davis v. State, 461 So.2d 67, 69 n. 1 (Fla.1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985) (stating that ruling on change of venue should not be made prior to jury selection because impartial jury may be seated if trial court finds credible the assurances of prospective jurors that they can set aside extrinsic knowledge and decide case on the evidence); Manning v. State, 378 So.2d 274, 276 (Fla.1979) (approving procedure where ruling on defendant's motion for change of venue is delayed until attempt has been made to select jury). We reiterate that our affirmance of the trial court's order denying Rolling's motion is based on a review of all the evidence of pretrial publicity contained in the record. Moreover, our conclusion that this issue was properly preserved for review in no way suggests that a defendant should delay filing a motion for a change of venue, as Rolling did here.
[5] Rolling argues extensively that the trial court's award of additional peremptory challenges was insufficient in this case, because the court refused Rolling's request for a seventh one to peremptorily strike Ms. Kerrick, who sat as member of the jury. Rolling never challenged Ms. Kerrick for cause at any time during the voir dire or otherwise stated for the record why he wished to strike Ms. Kerrick. As with the other members of the jury, the court found credible Ms. Kerrick's assurances that she could put aside her extrinsic knowledge of this case and recommend a sentence based on the trial court's instructions and the evidence presented in court. Thus, we reject Rolling's argument that he was prejudiced by the trial court's failure to award him an additional peremptory challenge.
[6] We reject the State's argument that these claims of error are not properly appealable to this Court under Krawczuk v. State, 634 So.2d 1070 (Fla.1994), and Robinson v. State, 373 So.2d 898 (Fla.1979), because they do not survive his guilty plea. Rolling is not challenging the court's pretrial ruling as to the validity of his guilty plea, nor is he challenging the plea itself. To the contrary, Rolling challenges the court's pretrial denial of his motion to suppress as it pertains solely to the penalty phase proceedings. Here, Rolling's statements to Lewis and law enforcement officers were offered at the penalty phase to support three aggravating factors: in the course of a sexual battery; heinous, atrocious, or cruel; and cold, calculated, and premeditated. Rolling objected to the admission of these statements prior to opening statements and repeated his objection each time the evidence was introduced. Thus, this claim was properly preserved for our review.
[7] Respectively: prohibiting a lawyer from communicating about the subject of a representation with a person known to be represented by counsel unless the lawyer has the consent of the other lawyer; holding a lawyer responsible for conduct of other persons that would be a violation of professional obligations if the other person was a lawyer where the lawyer orders or otherwise ratifies the conduct involved.
[8] The United States Supreme Court has since clarified the Massiah rule in Patterson v. Illinois, 487 U.S. 285, 290-91, 108 S.Ct. 2389, 2393-94, 101 L.Ed.2d 261 (1988). In that case, the Court noted that, while the Sixth Amendment right to counsel attached with the filing of the indictment, police officers were not precluded from initiating questioning of the accused. Rather, the Court further explained in Patterson that the right to counsel must attach and be acknowledged by the accused before he or she receives the benefit of the Sixth Amendment protections set out in Massiah. Id. See also Phillips v. State, 612 So.2d 557, 558 n. 2 (Fla.1992) (recognizing that under article I, section 9 of the Florida Constitution, "[r]egardless of when the right attaches, the defendant must still invoke the right in order to be protected"); Traylor v. State, 596 So.2d 957, 968 (Fla.1992) (reiterating that under article I, section 9 of Florida Constitution, the state may not initiate any crucial confrontation with a defendant once a lawyer has been requested or retained). We note, however, that the United States Supreme Court's Patterson decision modifying the Massiah rule is not critical to the analysis of Rolling's claim in this case because he already was represented by counsel at the time of the alleged Sixth Amendment violation here. Thus, consistent with Patterson and our own caselaw, Rolling's Sixth Amendment right had attached and been sufficiently invoked.
[9] The trial court granted Rolling's motion to suppress as to statements Rolling made to Florida Department of Law Enforcement agents on April 17, 1991. These statements were not admitted against Rolling at his sentencing proceeding.
[10] In 1982, article I, section 12 of the Florida Constitution, relating to search and seizure, was amended:

Searches and seizures.The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.
The underlined portions above constitute the 1982 amendment. See Fla.H.J.R. 31-H (1982).
With the conformity clause amendment we are bound to follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations. Bernie v. State, 524 So.2d 988, 990-91 (Fla. 1988). In addition, article I, section 12 applies to both past and future United States Supreme Court decisions. Id. Nevertheless, when the United States Supreme Court has not previously addressed a particular search and seizure issue which comes before us for review, we are free to look to our own precedent for guidance. See State v. Cross, 487 So.2d 1056, 1057 (Fla.), cert. dismissed, 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986).