MAY, J.
 

 A sad tale of the murder of a homeless person sets the stage for the issues in this appeal. The defendant appeals his conviction on one count of second degree murder and two counts of attempted second degree murder, which resulted in concurrent sentences of thirty years’ imprisonment. Several issues were raised, but none warrant a reversal. We write to discuss the trial court’s denial of the defendant’s mo
 
 *907
 
 tion to' change venue due to pre-trial publicity. We affirm.
 

 Four young men congregated for an evening of alcohol, marijuana, and Xanax, which culminated in tragedy. They decided to take a trip to the beach, and a couple of them decided they wanted to “beat up a bum.” On this first trip, the defendant and co-defendant attacked their first victim, who was sitting on a bench at the downtown campus of FAU.
 

 A surveillance video captured the attack as the first victim was beaten by two males with baseball bats at 1:06 a.m. The victim suffered a skull fracture, a facial fracture, a laceration and swelling to his forehead, some tenderness in his cervical spine, and a deformity of his left forearm wrist area.
 

 The four then went to a park and attacked their second victim. During this attack, the defendant and co-defendant beat the victim with bats and shot him with a paintball gun. This victim did not survive the attack. Afterwards, they returned to the house of one of the attackers, at which point one of the young men departed and returned home for the evening. The remaining three ventured out again in the defendant’s truck.
 

 This time, the three young men came across another homeless man near a church, who was sleeping on the ground under a blanket. All three young men attacked the third victim, and ran off when he stood up and started yelling. This victim sustained head injuries and a shattered arm.
 

 The grand jury indicted the defendant with one count of first degree murder and two counts of attempted first degree murder. The defendant entered a not guilty plea. Subsequently, the defendant moved for a change of venue, which was accompanied by three affidavits and eighty-six media reports exhibiting the intense media coverage received by this case. In response to this media coverage, the trial court entered orders precluding extrajudicial comment. The amended order noted: “The instant case has already garnered a great amount of national and local coverage, and this Court believes that some extrajudicial comments may very well have already been prejudicial to the respective [parties’] rights.”
 

 The trial court' ordered the pre-screen-ing of four hundred jurors, sealed the names and addresses of the jurors, and prohibited the filming or photographing of their faces. However, the trial court did allow the media to record their audible responses.
 

 During the first round of jury selection, defense counsel advised the court that all the major newscasts had shown the surveillance video of the first incident the night before. Certain jurors confirmed being exposed to the news coverage, while others possessed copies of the local newspaper containing an article about the case. Of those jurors who had read the article, some had just read the article and others had discussed it as well.
 

 The trial court acknowledged the publicity generated by the case, and commented:
 

 [T]he blogs are the most disconcerting thing for the Court. People have very, very strong opinions once they have seen this video. I mean, it’s really disturbing, actually. And we saw it yesterday with people coming in that you know, I seen that video and I can’t put that out of my head and we tried our best to — we are trying to find a fair and impartial jury for these defendants here.
 

 And yet, some internet comments and online articles were either sympathetic to the defendants or unsympathetic to the homeless. Still, other comments focused on the defendants’ right to a fair trial.
 

 After pre-screening jurors, the defendant filed a renewed motion for change of venue with supplementary exhibits. The
 
 *908
 
 defendant requested to individually voir dire the jurors concerning the pre-trial publicity, and filed a motion for jury sequestration. The court denied the request to sequester the jurors.
 

 The trial court took the motion for change of venue under advisement, noting the 529 jurors examined and the routine showing of the surveillance video. The defendant renewed all of his pre-trial objections and motions, all of which were again denied.
 

 After opening statements, the trial court instructed the jury not to watch the news, read the paper, or talk to anyone about the case. Media coverage continued throughout the trial. During the trial, the third victim gave an interview outside the courthouse, which caused defense counsel to renew the motion for sequestration and move for a mistrial. The trial court questioned each juror individually, but denied the motions.
 

 The trial continued and the defendant once again renewed his motion for sequestration. Counsel cited numerous articles: a biography of one of the victims; an interview with the parents of the deceased victim; and a video featuring a good friend of the deceased victim that appeared on a website with footage of the funeral and the videotape of the incident. The defendant again renewed his motion for change of venue. The trial court denied the motions, noting the jurors’ obvious awareness of the community’s interest since jury selection started due to the “amount of press that’s been in the courtroom.”
 

 After closing arguments, the defendant renewed all motions, which the trial court denied. The jury returned a verdict finding the defendant guilty of second degree murder with a weapon as to Count 1, and guilty of attempted second degree murder with a weapon as to Counts 2 and 3. The trial court sentenced the defendant to concurrent terms of thirty years. From his conviction and sentence, the defendant appeals.
 

 “A motion for change of venue is a matter addressed to the sound discretion of the trial court, and the trial court’s decision will generally be upheld if there is no showing of a palpable abuse of discretion.”
 
 Straight v. State,
 
 397 So.2d 903, 906 (Fla.1981). We have the responsibility to independently evaluate the circumstances.
 
 Rolling v. State,
 
 695 So.2d 278, 285 (Fla.1997). The defendant has the burden to demonstrate prejudice.
 
 Manning v. State,
 
 378 So.2d 274, 276 (Fla.1979).
 

 The defendant argues the denial of his motion for change of venue deprived him of his constitutional right to a fair trial because the general state of mind of the jury venire was infected by the media attention given to the case. The State responds that notwithstanding the media attention, this jury tried the defendant solely upon the evidence. The jury members either had no knowledge of the case or were able to set aside that knowledge and be fair and impartial.
 

 “The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.”
 
 McCaskill v. State,
 
 344 So.2d 1276, 1278 (Fla.1977) (quoting
 
 Kelley v. State,
 
 212 So.2d 27, 28 (Fla. 2d DCA 1968)).
 

 We start with the basic premise that “pretrial publicity is normal and expected in certain kinds of cases ... and that fact standing alone will not require a change of venue.”
 
 Rolling,
 
 695 So.2d at 285. Trial courts must consider a two-pronged analysis: “(1) the extent and nature of any pretrial publicity; and (2) the
 
 *909
 
 difficulty encountered in actually selecting a jury.”
 
 Id.
 

 In evaluating the first prong, trial courts consider many factors, including: (1) the length of time between the crime and the trial and when the publicity occurred; (2) whether the publicity was factual or inflammatory; (3) whether the publicity was one-sided; (4) the size of the community; and (5) whether the defendant exhausted his peremptory challenges.
 
 Id.
 

 Here, the publicity began immediately after the crime when law enforcement released the surveillance video of the first attack to the media to help apprehend the perpetrators. The video was aired numerous times and the attacks received significant publicity up to and throughout the trial. More than two years elapsed between the crimes and the first round of voir dire. Nevertheless, in the initial veni-re, at least eighty-eight jurors admitted to having little or no knowledge about the case and at least eighty-two additional jurors in the second round also knew nothing about the case, including five of the jurors selected.
 
 [1]
 

 Second, the majority of coverage focused on the surveillance video of the first attack, which was admitted at trial and published to the jury. Third, the video was factual, even though it was graphic and disturbing. The media coverage alternated between condemning the actions, and, at other times, reminding the community of the defendants’ right to a fair trial.
 

 Fourth, Broward County is the second largest county in the State. This renders the publicity less likely to infect the entire community than it might in a smaller community.
 
 Manning,
 
 378 So.2d at 276. Fifth, the defendant exhausted all of his peremptory challenges. When all five factors are considered, the pretrial publicity, while extensive, did not so infect the community that it was impossible to select a jury who would try the case solely on the evidence.
 

 “The second prong of the analysis requires the trial court to examine the extent of difficulty in actually selecting an impartial jury at voir dire.”
 
 Rolling,
 
 695 So.2d at 285. We pause a moment to compliment the trial court, who took significant time, exhibited considerable patience, and thoughtfully imposed precautions to ensure the defendant received a fair trial. Hundreds of persons underwent
 
 voir dire
 
 until the trial court was satisfied that the jurors were impartial and qualified to serve on the jury. While arduous, jury selection was accomplished.
 

 We live in a day and age where news is instantaneous and pervasive. Within minutes, we are alerted to happenings from around the world. Video surveillance is commonplace and exposure of such video in the media is not uncommon. Access to media is available twenty-four hours a day, seven days a week. And the list of commentators expressing their opinions on every aspect of our lives is endless. Virtually no high profile case is immune to vast exposure on the electronic waves of today’s communication devices. We must rely on our justice system and those that toil within it to ensure the protection of our constitutional guarantees. We are confident that this defendant’s rights were protected and that he received a fair trial notwithstanding the pretrial publicity in this case. We find no abuse of discretion and affirm.
 

 Affirmed.
 

 DAMOORGIAN and LEVINE, JJ., concur.
 

 [1]
 

 . These numbers were provided by the State and appear to be accurate.