# Supreme Court of Florida

———————

No. SC15-2010

———————

**TERRY MARVIN ELLERBEE, JR.,**

Appellant/Cross-Appellee,

vs.

**STATE OF FLORIDA,**

Appellee/Cross-Appellant.

———————

No. SC16-922

———————

**TERRY MARVIN ELLERBEE, JR.,**

Petitioner,

vs.

**JULIE L. JONES, etc.,**

Respondent.

[December 21, 2017]

PER CURIAM.

Terry Marvin Ellerbee, Jr., appeals an order of the circuit court denying his

motion to vacate his conviction of first-degree murder and sentence of death filed

under Florida Rule of Criminal Procedure 3.851, and petitions this Court for a writ

of habeas corpus. The State cross-appeals the circuit court's finding of deficient performance of penalty phase trial counsel. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the postconviction court's order to the extent that it denies Ellerbee relief based upon his claim of ineffective assistance of guilt phase counsel. However, we conclude that Ellerbee is entitled to a new penalty phase proceeding pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017), and Mosley v. State, 209 So. 3d 1248 (Fla. 2016), and based on his claim of ineffective assistance of penalty phase counsel.

**FACTS AND PROCEDURAL HISTORY**

This Court detailed the following facts on direct appeal:

[O]n September 29, 2006, the body of Thomas Dellarco was found dead and decomposing, hidden under a blanket in the garage of his home. Dellarco was killed by a single .22 caliber bullet which entered the center of the top of his skull and traveled through his brain. Dellarco was seventy-two at the time of his death and had a number of health problems including gout, arthritis, partial blindness, trouble with his hearing, and difficulty with walking. Notwithstanding these infirmities, Dellarco lived alone with his pet dogs in a clean house on the Viking Prairie (the Prairie), a desolate, rural, and wooded area in Okeechobee County.

The sheriff deputies investigating the scene of the killing found cigarette butts strewn throughout Dellarco's house, blood stain patterns consistent with Dellarco having been shot from a distance greater than eighteen inches while he was sitting in the kitchen area of the home, and blood stains indicating that someone had attempted to clean the scene and dragged Dellarco's body into the garage. One of Dellarco's large German shepherd dogs—the one most protective of his master—was found dead outside the home with fatal bullet

wounds. Further investigation conducted by law enforcement revealed that, in the days following Dellarco's demise, someone was using Dellarco's bank card to obtain cash and make retail purchases, and someone unsuccessfully attempted to cash a $1000 check drawn on Dellarco's bank account—and in doing so left an inked thumbprint with a bank in Sebring, Florida.

The cigarette butts found in Dellarco's house contained saliva deposits which, when tested, contained DNA that uniquely linked Terry Marvin Ellerbee, Jr.—a twenty-one-year-old man who was living with his girlfriend and her infant child in various hunting camps on the Prairie—to the scene of the crime. The thumbprint and video footage obtained from the Sebring bank confirmed that Ellerbee was the individual who attempted to cash the check purportedly signed by Dellarco. Moreover, additional evidence, including receipts, eyewitness testimony, banking records, and video surveillance, established that Ellerbee was using Dellarco's vehicle and was the individual using Dellarco's bank card in the days following his death. When apprehended, Ellerbee ultimately confessed to entering Dellarco's house and killing him.

. . . .

. . . Ellerbee admitted that on the day of the murder he approached Dellarco's home and spoke in a friendly and "neighborly" manner to Dellarco, whom he otherwise did not know. Dellarco gave Ellerbee a cigarette and informed Ellerbee that he would be travelling into town, a considerable distance, to run errands. Ellerbee then walked into the woods adjoining Dellarco's home and, after watching Dellarco leave for town, he shot one of Dellarco's dogs that was in the yard. Ellerbee entered the house armed with a single-shot .22 caliber rifle and a pistol that he brought to "back [him] up, for the dogs." Ellerbee told police that he remained in Dellarco's house while Dellarco was away on his trip to town for a "good hour," and that he watched from inside the house as Dellarco returned and parked his vehicle outside the gate to the yard. Ellerbee stated that Dellarco, after first parking his vehicle, observed the dead dog and then walked across the yard. Thereafter, Dellarco came into the house angered, and then left the house to attend to his other dogs. During this time, Ellerbee remained in the house and hid in Dellarco's bedroom. After Dellarco was finished tending to his dogs outside, he came back inside the house and sat down at the kitchen table to make telephone calls. At this time, Ellerbee emerged from the bedroom, braced himself in a

doorway across the room, raised the .22 caliber rifle and fired it, killing Dellarco. According to Ellerbee, Dellarco did not threaten him in "any way"; rather, the victim was not aware of Ellerbee's presence in the house. Ellerbee admitted that after he killed Dellarco, he took a wallet and cash from the dead man's pants, and he then took and used Dellarco's vehicle. Ellerbee admitted to using Dellarco's bank card and trying to cash a check drawn on Dellarco's bank account, and taking a .20 gauge shotgun that he found in the house. Ellerbee also admitted that he moved Dellarco's body to the garage and covered it with a blanket when he could no longer "stand the smell."

. . . And, later in his confession, Ellerbee told police that, although he shot and killed Dellarco, he intended his single shot—which was fatal and hit the victim in the center of the top of the skull—to be a "miss shot" so as to distract the victim to facilitate an escape. Further, Ellerbee stated that he entered Dellarco's house looking for food and money.

Ellerbee v. State, 87 So. 3d 730, 734-37 (Fla. 2012), cert. denied, 568 U.S. 1093 (2013).

Following a jury trial, Ellerbee was convicted of the first-degree murder of Dellarco. Id. at 733. He was also charged with and convicted of cruelty to animals for shooting and killing one of Dellarco's dogs; burglary with an assault or battery while armed; grand theft of a firearm for stealing Dellarco's shotgun; and grand theft of a motor vehicle for stealing Dellarco's automobile. Id. The jury recommended a sentence of death for the murder by a vote of eleven to one. Id. After a Spencer[1] hearing, the trial court entered a sentencing order that accepted the jury's recommendation. Id.

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

The trial court found the existence of four statutory aggravators, which it merged into three: (1) the capital crime was committed while the defendant was on felony probation; (2) the capital crime was committed during the commission of a burglary, merged with pecuniary gain; and (3) the capital crime was cold, calculated, and premeditated without any pretense of moral or legal justification (CCP). Id. at 738.[2]

The trial court's findings as to mitigation were as follows:

(1) [Ellerbee] grew up without his mother, felt rejected by her, and was raised by his father (proven, but assigned little weight); (2) he did not have proper parental guidance from his father (proven in part—father was less than perfect, but loved Ellerbee, and never physically abused, neglected, or abandoned, him—very little weight); (3) he had a difficult childhood (proven, minimal weight); (4) he had a history of drug and alcohol abuse (proven, very little weight); (5) he suffers from a poor self-concept (proven, very little weight); (6) his parents were divorced, and he was from a broken home (proven, very minimal weight); (7) his mother suffered from mental illness (proven, very little weight); (8) his father abused his mother in front of him (proven, little weight); (9) his mother was cruel and unpredictable (proven, little weight); (10) he would go long periods without maternal contact (proven, very little weight); (11) his father abused drugs and alcohol (proven, little weight); (12) he has limited education (proven, very little weight); (13) he has a low IQ of 83 (proven, very little weight); (14) he suffered childhood trauma (proven, very little weight); (15) he has a history of suicide attempts and self-destructive behavior (proven, little weight); (16) he showed kindness to others (proven, minimal weight); (17) he was under the influence of intoxicants before, during, and after this incident (to the extent the evidence

_____

2. The State presented evidence of a fifth aggravator—the victim was particularly vulnerable due to advanced age or disability—but the trial court determined it was not established beyond a reasonable doubt.

- 5 -

established that Ellerbee used drugs before and after the murder, the trial court found these factors warranted very little weight—nevertheless, the court found that Ellerbee did not prove he was using or under the influence of drugs on the day of the murder, and the court specifically found that Ellerbee was able to "plan things"); (18) Ellerbee cooperated with authorities (proven, in part—Ellerbee cooperated after he was caught—little weight); (19) Ellerbee was a hard worker at several trades ("some evidence," little weight); (20) Ellerbee will adjust to prison life (proven, very little weight); (21) Ellerbee has "mental health issues," . . . (the trial court found that Ellerbee did not prove he suffered from fetal alcohol syndrome, a significant brain injury, bipolar disorder, ADD/ADHD, or memory deficits, and assigned little weight "to the defendant having a cognitive disorder"); (22) Ellerbee suffers from poor dental hygiene (proven, but no relationship established with murder—very little weight); (23) Ellerbee exhibited appropriate courtroom behavior (proven, little weight).

Id. at 742 n.3. The trial court concluded "the proven aggravating circumstances substantially outweigh the non-statutory mitigating factors," and imposed a sentence of death. Id. at 738-39.

## Direct Appeal Proceedings

Ellerbee raised eleven issues on direct appeal: (1) whether trial counsel presented an invalid defense to felony murder, and if so, whether Ellerbee was thereby denied due process, his right to a jury trial, and effective assistance of counsel; (2) whether the trial court erred in finding CCP; (3) whether the trial court erred in instructing the jury on the aggravating circumstance that the victim was particularly vulnerable due to advanced age or disability; (4) whether the trial court erred in overruling Ellerbee's objection to the prosecutor asking defense expert

- 6 -

Dr. Michael Riordan whether he telephoned the jail to advise that Ellerbee needed psychotropic medications; (5) whether the trial court erred in failing to consider certain statutory mitigating circumstances proposed by Ellerbee; (6) whether the trial court erred in denying Ellerbee's motion to suppress the evidence from the location where Ellerbee temporarily resided on the Prairie; (7) whether the trial court erred in denying Ellerbee's motion for special verdict forms; (8) whether the felony murder aggravator in section 921.141(5)(d), Florida Statutes (2006), is unconstitutional on its face and as applied; (9) whether the trial court failed to make the findings necessary for the imposition of the death penalty; (10) whether it was error for the trial court to use the aggravating circumstance that Ellerbee committed the murder while on probation; and (11) whether Florida's death penalty statute violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Id. at 739-48. This Court rejected all claims and affirmed Ellerbee's convictions and sentences. Id. at 748.

**Postconviction Proceedings**

On December 20, 2013, Ellerbee timely filed a Motion to Vacate Judgment of Conviction and Sentence pursuant to Florida Rule of Criminal Procedure 3.851. Ellerbee filed an amended motion on May 27, 2014. In his amended motion, Ellerbee raised the following claims: (1) the application of rule 3.851 to Ellerbee's case violates his rights to due process and equal protection because the rule applies

only to capital defendants and allows only one year to file a capital postconviction motion; (2) section 27.7081, Florida Statutes (2016), and Florida Rule of Criminal Procedure 3.852 are unconstitutional both facially and as applied because they impermissibly restrict capital defendants' access to public records; (3) Florida Rule of Professional Responsibility 4-3.5(d)(4) is unconstitutional both facially and as applied because it prohibits a defendant from investigating claims of juror misconduct and bias that may be inherent in the jury's verdict; (4) the State failed to disclose exculpatory or impeachment evidence or both in violation of Brady v. Maryland, 373 U.S. 83 (1963); (5) trial counsel failed to disclose a conflict of interest; (6) trial counsel was ineffective during the guilt phase for (a) failing to move for a change of venue, (b) failing to object to prosecutorial misconduct during voir dire, (c) failing to properly challenge Ellerbee's waiver of his Miranda[3] rights and the voluntariness of his confession, (d) failing to move in limine to prevent the admission of irrelevant and unfairly prejudicial evidence, and (e) presenting an invalid defense to felony murder; (7) trial counsel was ineffective during the penalty phase for (a) failing to challenge the CCP aggravator, and (b) failing to investigate and present available mitigation evidence; and (8) section 922.105, Florida Statutes (2016), which governs execution of the death sentence and the existing lethal injection protocol, is unconstitutional.

---

3. Miranda v. Arizona, 384 U.S. 436 (1966).

An evidentiary hearing was granted on claims 4, 5, 6(c), 6(e), and 7. The hearing was conducted in two phases: Phase I was held on October 20-21, 2014, October 23, 2014, and January 22, 2015. Ellerbee presented twelve witnesses: attorney Stanley Glenn (trial defense second chair),[4] Amy Perron (trial defense investigator), Dr. Michael Riordan (trial defense mental health expert), attorney Norman Tebrugge (American Bar Association death penalty guidelines expert), Marvin Mosely, Sr. (Ellerbee's great uncle), Linda Mosely (wife of Marvin Mosely, Sr.), Marvin Mosely, Jr. (Ellerbee's second cousin), Starla Mosely (wife of Marvin Mosely, Jr.), Robert Ellerbee (Ellerbee's uncle), Randall Ellerbee (Ellerbee's uncle), Joshua Ellerbee (Ellerbee's cousin), and Cheryl Smith (Ellerbee's childhood guidance counselor). Phase II was conducted on June 25-26, 2015. Ellerbee presented two mental health experts: James Garbarino, Ph.D., and Marlyne Israelian, Ph.D. The State presented testimony from Dr. Riordan.

On September 29, 2015, the postconviction court entered an order denying all claims. In its order, the court concluded trial counsel was deficient for "failing to discover the noncumulative evidence of paternal neglect, paternal abuse, and the extent of paternal substance abuse." As a result, the postconviction court

---

4. Attorney Mark Harllee was first chair and was in charge of case management, strategy, and presentation of the penalty phase defense. Harllee died prior to the evidentiary hearing.

reweighed the aggravating and mitigating circumstances. The court elevated the weight assigned to mitigating factors (2), (3), and (11) to "moderate weight," but concluded the aggravating circumstances still substantially outweighed the mitigation. The court therefore determined Ellerbee was not prejudiced as a result of trial counsel's deficiency and denied relief on the claim of ineffective assistance of penalty phase counsel.

This appeal follows. On May 27, 2016, Ellerbee filed a petition for writ of habeas corpus with this Court, seeking relief pursuant to Hurst v. Florida, 136 S. Ct. 616 (2016).

**ANALYSIS**

Ellerbee presents several claims of ineffective assistance of trial counsel. A defendant alleging ineffective assistance of counsel must prove: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687 (1984). If the defendant fails to establish prejudice, the reviewing court need not make a specific ruling regarding deficiency. Id.

To establish deficiency, the defendant "must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986). The act or omission must constitute

- 10 -

an error "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. However, there is a strong presumption that trial counsel's performance was not ineffective, and "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. We have held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Therefore, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

To establish prejudice, the defendant must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. In other words, the defendant must show that counsel's "clear, substantial deficiency . . . so affected the fairness and reliability of the proceeding

- 11 -

that confidence in the outcome is undermined." Maxwell, 490 So. 2d at 932. Mere speculation is not sufficient to form the basis for postconviction relief. See Derrick v. State, 983 So. 2d 443, 462 (Fla. 2008) ("[I]n order to sufficiently undermine this Court's confidence in the outcome of resentencing, [the defendant] must rely on more than mere speculation."); see also Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000) ("Postconviction relief cannot be based on speculation or possibility.").

When reviewing a postconviction court's ruling on an ineffectiveness claim, this Court employs a mixed standard of review, deferring to the trial court's findings on factual issues that are supported by competent, substantial evidence, and reviewing the trial court's legal conclusions de novo. Bruno v. State, 807 So. 2d 55, 62 (Fla. 2001).

**Venue**

Ellerbee first contends that trial counsel was ineffective for failing to move for a change of venue. In considering this claim, we must determine whether there is a "reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue" had counsel made such a motion. Griffin v. State, 866 So. 2d 1, 12 (Fla. 2003) (quoting Wike v. State, 813 So. 2d 12, 18 (Fla. 2002)). In other words, the inquiry "is whether a change of venue was proper and whether counsel would have been successful had he moved for a change of venue." Id.

Under Florida law, a "defendant may move for a change of venue on the ground that a fair and impartial trial cannot be had in the county where the case is pending for any reason other than the interest and prejudice of the trial judge." Fla. R. Crim. P. 3.240. "The test for determining whether to grant a change of venue is whether the inhabitants of a community are so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Griffin, 866 So. 2d at 12. "In exercising its discretion regarding a change of venue, a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." Id. However, it is well-established that "pretrial publicity is normal and expected in certain kinds of cases, and that fact standing alone will not require a change of venue." Id. There are several factors to consider when evaluating pretrial publicity, including:

> (1) when the publicity occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community exposed to the publicity; and (5) whether the defendant exhausted all of his peremptory challenges in seating the jury.

State v. Knight, 866 So. 2d 1195, 1209 (Fla. 2003).

Regarding the second prong of the analysis, the critical inquiry is "whether any difficulty encountered in selecting a jury . . . reflected a pervasive community

- 13 -

bias against [the defendant] which so infected the jury selection process that it was impossible to seat an impartial jury" in the county where the trial was held. Rolling v. State, 695 So. 2d 278, 287 (Fla. 1997). "The ability to seat an impartial jury in a high-profile case may be demonstrated by either a lack of extrinsic knowledge among members of the venire or, assuming such knowledge, a lack of partiality." Id. at 285. A change of venue is required if "it is impossible to select jurors who will decide the case on the basis of the evidence, rather than the jurors' extrinsic knowledge." Id. (citing Copeland v. State, 457 So. 2d 1012, 1017 (Fla. 1984)). However, "jurors need not be totally ignorant of the facts of the case nor do they need to be free from any preconceived notion at all . . . . [I]f prospective jurors can assure the court during voir dire that they are impartial despite their extrinsic knowledge, they are qualified to serve on the jury, and a change of venue is not necessary." Id. (citing Davis v. State, 461 So. 2d 67, 69 (Fla. 1984)). This Court has also recognized:

> In some instances, the percentage of prospective jurors professing an extrinsic knowledge of the case or a fixed opinion has been used to determine whether pervasive community prejudice exists. However, even where a substantial number of prospective jurors admit a fixed opinion, community prejudice need not be presumed. For instance, in [Murphy v. Florida, 421 U.S. 794 (1975)], the United States Supreme Court evaluated these percentages as follows:
>
> > In the present case, . . . 20 of 78 persons [or 25.6%] questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20

- 14 -

> more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.
>
> 421 U.S. at 803 (footnote omitted).

Id. (parallel citations omitted).

Here, Ellerbee has failed to establish that a change of venue would have been proper or that trial counsel would have been successful had he moved for a change of venue. Pretrial publicity in this case was minimal: the local newspaper, the Okeechobee News, published only two articles about the murder. Ellerbee does not allege that these publications were either inflammatory or favored the prosecution. Further, the articles were published shortly after the murder occurred, approximately three years prior to jury selection.

We have held that a change of venue was not warranted in several cases involving much more extensive pretrial publicity. In Rolling, the defendant was convicted of the murders of five local college students. 695 So. 2d at 281. On direct appeal, this Court rejected Rolling's argument that the trial court abused its discretion when it denied his motion for a change of venue. Id. at 287-88. We acknowledged it was "undisputed that the brutal slaying of five young students deeply affected the college community of Gainesville, Florida and generated overwhelming local and national media attention. While the amount of media

- 15 -

coverage in this case makes it unique, the extent of publicity it received was certainly not surprising or unwarranted given the circumstances of this case." Id. at 287 (emphasis added). In rejecting Rolling's contention "that the responses of both prospective and actual jurors during voir dire further demonstrated a real, community-wide prejudice and animosity toward him," the Court explained:

> Not surprisingly, of course, every member of the venire had some extrinsic knowledge of the facts and circumstances surrounding this case. Also as expected, the responses of certain prospective jurors showed that their knowledge of the case prevented them from sitting impartially on the jury. Nevertheless, the animus toward Rolling expressed by these individuals reflected nothing more than their own personal beliefs or opinions. Contrary to Rolling's assertions, we find no reason to believe that certain prospective jurors who voiced a bias against Rolling—none of whom sat on Rolling's jury—somehow spoke for the entire Alachua County community.

Id. (emphasis added).

Similarly, in Copeland, the defendant was convicted of the kidnapping, rape, and murder of a nineteen-year-old woman in Wakulla County. 457 So. 2d at 1014. The defendant argued the trial court erred in denying his motion for a change of venue because the "general atmosphere of hostility against him was established by testimony that the crimes were the main topic of conversation in the rural community of Wakulla County." Id. at 1017. We disagreed, holding a change of venue is not required "in every highly publicized criminal prosecution in a rural community." Id. Even where "every member of the jury panel had read or heard something about the crime," a presumption of impartiality is supported by

- 16 -

veniremembers' assurances that "they would be able to disregard the previously gained information and render a verdict based on the evidence presented in court." Id. It is the defendant's burden to overcome this presumption and "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' " Id. (quoting Murphy v. Florida, 421 U.S. 794, 800 (1975)).

According to Ellerbee, the fact that so many jurors acknowledged having at least some extrinsic knowledge of the case reflects the existence of pervasive community prejudice. Roughly 32% of the veniremembers indicated they either had been previously exposed to the facts of the case or knew someone involved in the trial. However, as exemplified by the decision in Rolling, this fact alone is not sufficient to warrant a change of venue.

Further, to prevent the members of the venire from hearing the potentially prejudicial opinions of other jurors, trial counsel moved for individual, sequestered voir dire on several topics, including prior knowledge about the case. Nearly forty jurors were interviewed individually, many of whom indicated they remembered reading something about the case in the local newspaper shortly after the murder. However, because the articles were published approximately three years prior to voir dire, those jurors indicated they only had vague recollections of the media coverage. Of those jurors who were individually interviewed, nearly all stated they

had not formed an opinion as to Ellerbee's guilt and would decide the case based on the facts presented during trial, rather than relying on facts learned through extrinsic knowledge. Trial counsel moved to strike any juror who so much as implied they could not be impartial, even if the juror explicitly stated he or she could be.

Ellerbee's trial counsel questioned jurors extensively about their ability to follow the law and remain impartial, and those who ultimately sat on the jury provided assurances they could. All members of the venire who believed they could not be impartial were excused. Therefore, to overcome the presumption of impartiality, Ellerbee must "demonstrate 'the actual existence of such an opinion in the mind[s] of the juror[s] as will raise the presumption of partiality.' " Copeland, 457 So. 2d at 1017. However, he has failed to do so. Ellerbee's general assertions of community prejudice fall short of demonstrating that any of the jurors actually seated on his jury held an opinion that could be construed as partial.

Moreover, there is no indication that trial counsel had any difficulty selecting a jury, and Ellerbee does not allege as much. Nothing in the record even hints at the existence of a pervasive community bias against Ellerbee. On the contrary, the "jury selection process employed in this case and the responses of actual jurors during questioning show[] that it was possible to seat an impartial jury" in Okeechobee County. Rolling, 695 So. 2d at 288.

- 18 -

As evidenced by the foregoing, this is not a case where "the inhabitants of [the] community [were] so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds." Griffin, 866 So. 2d at 12. There is no reasonable probability the trial court would, or should, have granted a motion for change of venue. Accordingly, trial counsel was not ineffective for failing to make such a motion, and we affirm the denial of this claim.

## Prosecutor's Comments During Voir Dire

Ellerbee next argues that the prosecutor made improper comments about God and the Bible during voir dire, and trial counsel was ineffective for failing to object or move for a mistrial. During voir dire, the prosecutor questioned veniremembers about their ability to withstand pressure from other jurors during deliberations. The prosecutor proposed several hypothetical scenarios wherein their beliefs could be challenged, or where they could feel pressured to reach a compromise. When the prosecutor reached one juror, the following exchange ensued:

> [STATE]: . . . Oh, my, Mr. . . . is a pastor.
> [JUROR]: Yes, sir.
> [STATE]: . . . [P]erhaps you could cite, Pastor . . ., Romans for us as it relates to the function or—of government or am I putting you on the spot?
> [JUROR]: To what phase?
> [STATE]: I don't know. I'm not a biblical scholar. I figured you could help me out a little bit. Big trouble. I guess it's—what I'm

referring to is the concept that the law here as it exists in the courtroom and it is our obligation to respect man's law?

[JUROR]: Yes, absolutely.

[STATE]: How about—you're a pastor. You are—I mean, I don't know where you fall on the pantheon of nurses and teachers but, I mean, you—care about the ultimate issue which is the human soul.

[JUROR]: Absolutely.

[STATE]: What does the death penalty issue—what does this raise in your mind, what concerns does it create with you?

[JUROR]: Well, I believe strongly that while there is always forgiveness, there are also consequences for your actions.

[STATE]: Okay. What do you mean—when you say that, what does that mean?

[JUROR]: I mean, by consequences?

[STATE]: Yeah.

[JUROR]: Well, the forgiveness ultimately through God does not excuse us all from the consequences of man.

[STATE]: Okay. And are you telling us that you would be able to, if you were selected as a juror in this case, . . . if convinced that there were beyond a reasonable doubt, . . . sufficient aggravations to warrant [the] death penalty and insufficient mitigation, that you could not only vote for the death penalty, but sign off on the verdict form?

[JUROR]: Yes, sir.

[STATE]: Could you stand in front of your congregation Sunday morning having done that?

[JUROR]: Yes, sir.

[STATE]: Okay. You feel that—so when you say there are consequences for our actions, are the consequences dictated by what we do?

[JUROR]: Yes, they are, and in regards to the law.

[STATE]: Right. Right. And do you see that—well you may have Christian beliefs that allow you to forgive people and—and so forth. You understand that here in court, unfortunately you gotta leave, I won't say God, because <u>I think you probably should take God with you into the jury room</u>, but, <u>you've got to rely on the law as provided you by the judge</u>?

[JUROR]: Yes, sir.

[STATE]: Okay.

. . .

[STATE]: Okay. And <u>you're gonna follow the law</u>?

- 20 -

[JUROR]: Yes, sir.

(Emphasis added.)

Ellerbee contends the prosecutor in effect told the jury it was ultimately up to God whether Ellerbee was convicted and sentenced to death, not them, thereby excusing the jury from responsibility for their verdict and sentence in violation of Caldwell v. Mississippi, 472 U.S. 320 (1985). In Caldwell, the United States Supreme Court held it is constitutionally impermissible to minimize a jury's sense of responsibility for its role in capital sentencing. Id. at 333. In capital cases, jurors are placed "in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community." Id. Under these circumstances, "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." Id.

Here, although the prosecutor said, "I think you probably should take God with you into the jury room," he immediately followed up by asking the juror if he agreed that "you've got to rely on the law as provided [to] you by the judge." We conclude the statement with regard to God did not minimize the jury's role: the prosecutor did not imply that the jurors should consider God when reaching their decision, nor did he imply it was ultimately up to God whether Ellerbee was

- 21 -

convicted. On the contrary, the prosecutor's remarks clarified that the jury's role is to follow the law as provided by the court, regardless of their faith or beliefs. When read in context, it is clear the prosecutor intended to ascertain whether the juror could set aside his religious convictions and follow the law. This conclusion is bolstered by the fact that the prosecutor asked the juror not once, but twice, whether he would follow the law. Trial counsel cannot be deficient for failing to object to these remarks, which were reasonable in evaluating a pastor's ability to serve as a juror.

This Court has cautioned prosecutors "that arguments invoking religion can easily cross the boundary of proper argument and become prejudicial." Lawrence v. State, 691 So. 2d 1068, 1074 n.8 (Fla. 1997); see also Ferrell v. State, 686 So. 2d 1324, 1328 (Fla. 1996) ("Without question, trial judges and attorneys should refrain from discussing religious philosophy in court proceedings."). However, not every statement referencing God or the Bible is prejudicial. "A new trial should be granted when it is 'reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done.' " Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d 287, 289 (Fla. 1976)). In Lawrence, the defendant alleged the prosecutor made improper comments during closing statements "that equated the jury's sentencing task to 'God's judgment of the wicked.' In his closing argument, the prosecutor

recounted a biblical story in order to describe the weighing process a jury must employ." 691 So. 2d at 1074. Lawrence argued the "prosecutor's comments appealed to the jurors' emotions rather than reason and thus tainted the jury's recommendation." Id. This Court noted trial counsel failed to object to the statements and concluded that "in the context of the entire argument [they did] not amount to fundamental error." Id.

Similarly, in Ferrell, this Court determined the trial court's comments to the jury about the Bible, which counsel did not object to, did not constitute fundamental error. 686 So. 2d at 1328. There, the trial judge made comments during voir dire regarding the origins of the Biblical commandment "thou shalt not kill":

> THE COURT: Let me add one thing here, counsel, every time this comes up we have different opinions about it. . . .
> Inquiry has been made over the last twenty or thirty years that both Hebrew and Christian scholars, they tell us—these are students who have been studying it for long years—they tell us in the original Bible, in Greek, Hebrew, and Arabic, the Ten Commandments say "Thou shalt not commit murder." It doesn't say anything about "Thou shalt not kill." It says, "Thou shall not commit murder." It does not say, "Thou shalt not kill."

Id. at 1327-28. This Court determined "the judge's brief discussion was harmless when viewed in light of the entire record." Id. at 1328.

As previously discussed, the prosecutor's comments in this case were appropriate when viewed in context. They were intended to ascertain the ability of

- 23 -

a pastor to set aside his religious convictions and follow the law. Ellerbee has failed to establish that trial counsel's failure to object to these comments was outside the "broad range of reasonably competent performance under prevailing professional standards." <u>Maxwell</u>, 490 So. 2d at 932. Therefore, trial counsel was not deficient for failing to object to such comments.

Additionally, in light of the overwhelming evidence against him, Ellerbee cannot demonstrate prejudice. The prosecutor's remarks were isolated: jury selection took several days and yielded a transcript of over 1100 pages. Moreover, the pastor was not selected to sit on the jury. There is no reasonable probability that the outcome of the trial would have been different if trial counsel had objected to the prosecutor's comments, and our confidence in the outcome of the guilt phase proceedings has not been undermined. Accordingly, we affirm the denial of this claim.

**Answering Machine Tape**

In Ellerbee's next claim, he argues that trial counsel was ineffective during the guilt phase for failing to move in limine to prevent admission of the victim's answering machine tape or for failing to redact certain portions of the tape. During trial, the State introduced as evidence an answering machine tape from Dellarco's home. The messages span the days between when Dellarco was killed and when his body was found. The tape contained messages from various people, including

individuals who had business with Dellarco, such as his realtor, banker, doctor, and veterinarian. Other messages were from family and friends expressing concern about their inability to reach Dellarco. Examples include: "Where are you? Where are you? I haven't talked to you on the phone in a while"; "I'm very concerned about you. We've been trying to reach you since Friday and you're not answering your phone"; "I can't understand this. Please pick up the phone. . . . Answer your calls, come on, Tom"; "I tried to get a hold of you last Friday, and today again on Monday"; "I've been trying you all weekend and now it's Tuesday evening around five. . . . I'm getting very concerned"; "Boy, I'm getting real worried now. I'm going to call the police. You've got to call me or I'm going to call the police"; "It is Wednesday night about 6:30. Tommy, I'm so worried." Many of the messages from friends and family ended with the caller saying "I love you."

During trial, a detective testified that the answering machine tape was helpful to the investigation because the number of messages on the tape provided a time frame as to how long Dellarco was not answering his phone, as well as who was trying to contact him. Trial counsel initially objected to the introduction of the tape as hearsay. The State countered that the tape was not being offered for the truth of the matter; rather, it established a time frame as to when Dellarco stopped answering his phone, and showed how the investigation led to Ellerbee as a

suspect.[5]  Trial counsel then withdrew the objection.  The postconviction court rejected this claim, concluding Ellerbee could not "demonstrate prejudice on this record containing overwhelming evidence of guilt."  The court did not address whether counsel was deficient.  Id.

Ellerbee argues trial counsel should have moved to exclude Dellarco's answering machine tape because the messages served only to incite the sympathy of the jurors and did not clearly establish a time frame because the machine's time stamp was not set.  However, several of the callers did state when they were calling and when they were last able to reach Dellarco.  Moreover, as the detective explained, the number of messages left on the tape (twenty-five) indicated that a significant amount of time had passed since Dellarco had last answered his phone.

Because an evidentiary hearing was denied on this claim, it is impossible to ascertain why trial counsel withdrew his objection and why he did not move to redact the messages that lacked a time reference.  However, even if trial counsel was deficient, Ellerbee cannot establish prejudice.  Ellerbee did not deny killing Dellarco, but insisted it was accidental.  Consequently, the tape did not bear on Ellerbee's guilt, and there is no reasonable probability the outcome of the trial

---

5. The tape included a message from a bank representative expressing concern about a check of Dellarco's that was presented to be cashed.  It was later established that Ellerbee was the individual trying to cash the check.  Ellerbee, 87 So. 3d at 734.

would have been different if counsel had objected to the tape's introduction or redacted portions of it. Accordingly, our confidence in the outcome of the guilt phase proceedings has not been undermined, and Ellerbee is not entitled to relief on this claim.

**Theory of Defense**

In his final guilt phase claim, Ellerbee argues trial counsel was ineffective for presenting a legally invalid defense. Counsel incorrectly stated that Ellerbee's actions could not constitute felony murder because the killing was accidental. Ellerbee asserts trial counsel should have pursued a valid defense to the underlying felony to attack the felony murder theory, but fails to identify what that defense could be.[6] Although an evidentiary hearing was granted on this issue, Ellerbee failed to present any witnesses or other evidence to prove this claim. Therefore, the postconviction court denied this claim as being abandoned or waived. We agree and affirm. See Wickham v. State, 124 So. 3d 841, 860 (Fla. 2013) (holding ineffective assistance of counsel claim was abandoned or waived where the claim was raised in the postconviction motion and an evidentiary hearing was granted to address the claim, but the defendant failed to pursue it).

---

6. Given the overwhelming evidence of guilt—including a full confession—Ellerbee admits the defense's only viable option may have been to concede guilt and immediately pursue a mitigation strategy.

**Ineffective Assistance of Penalty Phase Counsel**

Based on our conclusion that Ellerbee is entitled to a new penalty phase proceeding pursuant to <u>Hurst</u> and <u>Mosley</u>, we would normally decline to reach his penalty phase claims. Nevertheless, we feel compelled to address this issue because of the egregious nature of Ellerbee's upbringing, counsel's failure to discover it, and the prejudice Ellerbee suffered as a result.[7] Due to the multiple failures of trial counsel to explore and present various aspects of Ellerbee's childhood, compounded with the presentation of conflicting evidence during the penalty phase, we cannot say the outcome of the penalty phase would have been the same had the jury heard this evidence.

In his postconviction motion, Ellerbee argued trial counsel was ineffective during the penalty phase for failing to discover and present "statutory and nonstatutory mitigating evidence of: PTSD, physical and emotional abuse by his alcoholic, drug-addicted father, and expert testimony about the physical, emotional, and psychological effects of child abuse and witnessing spousal violence." After an evidentiary hearing was held on this claim, the postconviction court found "deficient performance of trial counsel in failing to discover the

---

7. Our discussion of Ellerbee's claim of ineffective assistance of penalty phase counsel is limited to whether trial counsel was ineffective for failing to discover and present certain mitigation. We decline to address Ellerbee's claim that penalty phase counsel was ineffective for failing to move to exclude evidence related to the CCP aggravator.

noncumulative evidence of paternal neglect, paternal abuse, and the extent of paternal substance abuse." While we agree with the postconviction court that penalty phase counsel was deficient, we disagree with its conclusion that Ellerbee was not prejudiced by that deficiency.

## Failure to Discover Childhood Abuse

During the penalty phase, eleven lay witnesses testified about Ellerbee's upbringing. Several of them testified regarding the abuse Ellerbee and his siblings suffered at the hands of their mother, Brenda Jacobs (Brenda). Shannon Smith (Shannon), Ellerbee's half brother, lived with Brenda and Ellerbee's father, Terry Ellerbee, Sr. (Terry),[8] for several years, but was eventually removed from their care by the Department of Children and Families (DCF) when bruises were discovered on his body. Shannon testified the bruises were a result of being beaten by Brenda and Terry. Shannon testified that during his stay with the Ellerbees, he, Ellerbee, and Ellerbee's half sister were mistreated. For example, Brenda told the children they were worthless, poked them with a cattle prod, forced them to drink castor oil as punishment, and beat them with hoses, switches, and cutting boards. Terry sometimes beat them with his belt. The children were always hungry

---

8. Because Ellerbee and his father share the same name, we refer to the defendant's father as "Terry" and the defendant as "Ellerbee."

because Brenda did not feed them consistently.  She kept a padlock on the refrigerator and punished the children for asking for food.

Ellerbee's uncle testified that Brenda wanted nothing to do with Ellerbee.  In his opinion, "she hated [Ellerbee] very much."  He said this rejection was very hard for Ellerbee.  Ellerbee's paternal grandmother testified that "Brenda was a mean, cold hearted person" who was not involved much in Ellerbee's life.  Brenda eventually walked out on the family when Ellerbee was seven years old.

However, only limited testimony was presented during the penalty phase regarding abuse by Terry.  In fact, several witnesses testified that Ellerbee and Terry were close and were more like friends than father and son.  Although testimony was presented that Terry was a heavy drinker who exposed Ellerbee to drugs and alcohol at an early age, other witnesses, including Terry himself, contradicted these assertions.  The overall sentiment was that Terry did the best he could for Ellerbee, even if he was not a perfect father or role model.  This is reflected in the trial court's sentencing order:

> [T]his Court is convinced that as imperfect as his father was, he loved the defendant and spent as much free time with his son as he could. He would take the defendant when he was a child to work with him and ride the tractor, as at times, there was no one to watch the defendant while his father worked.  [Terry] took the defendant to hog and deer hunt and to fish.  [Terry] never physically abused the defendant, although he may have spanked him.  [Terry] provided for his son as best he could given their circumstances and never neglected or abandoned him.

(Emphasis added.) As a result, the trial court assigned "very little weight" to the nonstatutory mitigator that Ellerbee had little proper parental guidance from his father. In addition, other related mitigators (Ellerbee suffered from a difficult childhood, and Terry abused drugs and alcohol) were afforded minimal weight and little weight, respectively.

However, testimony presented during the evidentiary hearing painted a much darker picture of Ellerbee's childhood, and it was revealed that Terry physically abused Ellerbee. Witnesses testified that Terry would whip and beat Ellerbee with his belt, punch him in the chest to "knock the air outta him," and frequently hit him with his fists or the back of his hand. One witness testified that she saw Terry punch Ellerbee in the head when he was very young, between three and six years of age. Family members opined the beatings went beyond normal discipline.

Terry would bring Ellerbee to the "bad part of town" while he looked for women and drugs, sometimes locking Ellerbee in the toolbox of his truck while he did so. On other occasions, Terry would drop Ellerbee off with a relative for several days, often wearing dirty clothes with nothing to change into, while Terry went on a bender. When Ellerbee was sixteen or seventeen, Terry asked his aunt if Ellerbee could stay with her family, saying "it was his last chance of having any kinda life." She testified she believed Terry "didn't want" Ellerbee and was just

trying to get rid of him. Ellerbee was described as "undernourished" when he arrived at his great-aunt's house. Ellerbee became possessive of his food, and "would act like he wasn't never gonna [get] another bite."

According to Cheryl Smith, Ellerbee's middle and elementary school guidance counselor, Terry was not involved in Ellerbee's education and was unresponsive to correspondence from the school. Smith found Terry to be "intimidating," and "felt that he didn't want to be there and didn't particularly care what we did with [Ellerbee]." Ellerbee was frequently absent from school, a fact that concerned Smith. She explained that Ellerbee was placed in a dropout prevention program in middle school, but Terry withdrew Ellerbee from the program in the eighth grade. Ellerbee eventually dropped out of school at age sixteen, after unsuccessfully attempting to complete the ninth grade.

Testimony was also presented regarding Terry's alcohol and substance abuse. Terry's nephew described him as a "bar hopper" who drank, used drugs, and "had a lot of women through his house." He was not welcome in certain family members' homes because of his lifestyle. Another family member testified that Terry was always drunk, and she tried to stay away from him because he made her uncomfortable. Ellerbee's great-aunt described Terry as a womanizer who had no respect for anybody and was drunk most of the time.

According to the testimony of several family members, Terry also failed to provide Ellerbee with his basic needs, including decent clothing, housing, or nourishment. Ellerbee almost never had clean clothes to wear, and his head was always kept shaved due to lice infestations. Ellerbee's great-uncle testified that on one occasion, he had to purchase new pants for Ellerbee because the ones he was wearing were soiled with feces. Family who visited Terry and Ellerbee at their trailer described it as "filthy" and "unsanitary," saying it "should have been condemned." When Ellerbee's great-uncle was asked to describe the living conditions, he said, "If you can imagine a dump, it's worse." The trailer had bugs, rotten furniture, and piles of dirty dishes everywhere. The clutter made it difficult to walk around. Some family members avoided visiting them because of the filth.

Further, in contrast to the rosy image of Terry taking Ellerbee on father/son hunting trips as presented during the penalty phase, testimony presented during the evidentiary hearing cast these trips in a different light. According to witnesses' first-hand accounts, the trips were usually taken at night, involved a lot of drinking, and were described as "crazily dangerous" because the hogs were "very mean" and often massive in size—nearly 400 pounds with six-inch tusks. Ellerbee was allowed to drink on the trips, too, despite being only thirteen or fourteen years old. If the adults became too intoxicated, Ellerbee was forced to drive them home. Hunting dogs were always taken on the trips, but they were often mistreated by

Terry, who would kick them and strike them with his hands or a flashlight. Terry killed the dogs that were injured or refused to hunt—something Ellerbee witnessed first-hand. On one particular trip, when Ellerbee was seven or eight, his father took him hunting in the middle of the night, and "the dogs were howling, the pigs were squealing, the men were drunk, shots were fired off, he was really terrified . . . and he start[ed] to cry" as he hid in Terry's truck. When Terry discovered him, he pulled him out through the window and proceeded to beat him for crying, saying he would "give [Ellerbee] something to cry about if [he] didn't stop."

All of the witnesses who testified during the evidentiary hearing stated they were never contacted by trial counsel, but would have been available and willing to testify if they had been contacted.

### Failure to Develop Mental Health Mitigation

In his postconviction motion, Ellerbee argued that trial counsel was ineffective during the penalty phase for failing to present expert testimony to explain how Ellerbee's abusive background and extensive drug use damaged his brain and affected his cognitive development. The postconviction court found that trial counsel was not deficient. We disagree. Trial counsel's presentation of mental health mitigation consisted of conflicting evidence and unsubstantiated claims that Ellerbee suffered from various mental disorders. When viewed in the

context of the entire penalty phase, we conclude that trial counsel was ineffective in the presentation of mental health mitigation.

The testimony presented during the postconviction evidentiary hearing not only expanded upon the abuse Ellerbee suffered during his upbringing, but also explained how that abuse directly impacted Ellerbee's development. According to the postconviction testimony of defense expert Dr. James Garbarino, a professor of psychology, "most children who grow up in severely abusive, neglectful homes who experience early trauma grow up to be very damaged and impaired in executive function[ing] and emotional regulation" which can result in "a variety of antisocial behavior as well as self-destructive behavior, of which committing a murder is certainly one." He explained there is "growing evidence . . . that child abuse is one of the most powerful destructive forces in the life of a child."

Dr. Garbarino also testified about Adverse Childhood Experiences (ACE) and studies that have drawn a correlation between adverse experiences in childhood and bad outcomes later in life. There are ten possible ACEs identified by the Centers for Disease Control and Prevention as adversely affecting child and adolescent development: (1) emotional abuse, (2) physical abuse, (3) incarceration of a household member, (4) emotional neglect, (5) physical neglect, (6) divorced or separated parents, (7) domestic violence, (8) exposure to substance abuse, (9) depression or mental illness of a family household member, and (10) sexual

- 35 -

abuse. Ellerbee was exposed to at least the first nine adverse experiences. Only one-tenth of one percent (or one in one thousand people) are exposed to more than seven ACEs. In other words, Ellerbee was in the "bottom 1 percent as far as quality of life as a child growing up." Dr. Garbarino explained that children exposed to at least nine of these adverse experiences will have impaired development, including impaired emotional regulation, executive function, and decision making. A high exposure to ACEs, such as what Ellerbee experienced, is correlated to an increased risk of substance abuse, depression, domestic violence, and suicide, among other negative outcomes.

Dr. Garbarino also testified regarding psychological maltreatment as a source of abuse. He explained that psychological abuse comes in many forms: (1) rejection (giving the child messages of rejection; telling them they are worthless), (2) isolation (cutting the child off from normal social experiences that are critical to becoming well-socialized), (3) ignoring (depriving the child of interaction), (4) terrorizing (using fear to manipulate and threaten the child), and (5) corrupting (missocializing the child; engaging the child in inappropriate experiences with substance abuse, sexuality, or illegal behavior). Dr. Garbarino found instances of all five forms of psychological abuse throughout Ellerbee's childhood.

Dr. Garbarino opined that Brenda's rejection and abandonment of Ellerbee, both before and after she walked out on the family, profoundly affected his development. Dr. Garbarino explained that parental rejection is a very powerful form of psychological maltreatment. "[P]arental rejection by itself accounts for about 25 percent of bad outcomes in development," whereas "smoking only accounts for 15 percent of lung cancer." Therefore, he opined, parental rejection "is sort of worse for you developmentally than smoking is physiologically." Dr. Garbarino explained that maternal abandonment and rejection "is both statistically unusual and . . . because of the primacy of the maternal/child bond, particularly devastating and destructive and . . . the kind of rage and sadness and depression and damage it does is—is paramount."

Dr. Garbarino also found Ellerbee's age of twenty-one at the time of the murder to be significant. He acknowledged the "legal bright line" of eighteen being the age of adulthood, but opined that such a bright line is at odds with developmental psychology. He explained that a person's brain does not fully develop emotional regulation, executive function, and decision making until he reaches his late twenties. He added, "And that's for a normal population who hasn't had traumatic abuse at childhood." He opined that while Ellerbee was legally an adult, he was not "a fully functioning adult" developmentally.

According to Dr. Garbarino, Ellerbee's abusive childhood would have further impaired his intellectual and emotional development.

Defense expert Dr. Marlyne Israelian also testified during the evidentiary hearing about how Ellerbee's abusive childhood and subsequent drug use affected his brain development and behavior. She explained that humans are born with brains that are still developing, and environmental factors play a significant role in postnatal brain development. For example, emotion is regulated by the frontal lobe. Because the frontal lobe is not fully developed at birth, an infant needs to look to the primary care giver, usually the mother, to learn appropriate reactions to new situations. Therefore, "bonding, nurturing, [and] soothing affection" are critical to development of the frontal lobe, and consequently, emotional regulation. Children who are deprived of such bonding—because they have been abandoned or neglected by their mothers, for example—will "have tremendous difficulties in adulthood with relationships and with emotional regulation."

Dr. Israelian also explained that "the circuits in the brain are drastically and permanently changed by chronic stress and maltreatment." If a child grows up in a dangerous or abusive environment, his or her brain will constantly be responding to stressors by sending distress signals to the rest of the body. The body reacts accordingly—respiration, perspiration, and heart rate increase, senses are heightened, etc.—to prepare the body for "fight or flight." Similar to how a

muscle strengthens the more it is used, the "fight or flight" response is strengthened the more the distress signals are fired. As a result, the brain will begin sending distress signals even in the absence of real danger or conflict. Consequently, the brain will develop in such a way that the individual's reactions are governed by his or her emotions, not reason.

In addition, stressful events result in the body releasing cortisol. Dr. Israelian explained, "[Y]ou know how we say stress kills you? It does it through cortisol." Chronic levels of cortisol can cause damage to organ systems and brain functioning. Consequently, children who have been chronically maltreated have an increased risk of depression, anxiety, posttraumatic stress disorder (PTSD), substance abuse, personality disorders, and psychosis. Chronic maltreatment also impairs the development of the frontal lobe, resulting in difficulties with problem solving, impulse control, and considering the long-term consequences of one's actions.

Dr. Israelian described the chronic maltreatment Ellerbee suffered as a child and opined that it would have had profound effects on Ellerbee's development. Dr. Israelian's interview of Ellerbee's family revealed that his mother, Brenda, never held Ellerbee or showed any interest in him. Brenda would lock the food away and refused to feed the children all day. The children would only be fed at night, after the adults ate. Brenda would lock the children out of the house for hours without

food or water, and if she caught them sneaking food, she would beat them. On several occasions, Brenda forced the children to stand on their toes, and if their feet dropped from fatigue, she would whip the backs of their heels. The abuse was so severe that Ellerbee's half brother and half sister were removed from the home by DCF. Shortly after, Brenda moved out, leaving Ellerbee with Terry. The couple subsequently divorced.

When Ellerbee was ten, he went to live with Brenda. However, the living arrangement ended abruptly. One day when Ellerbee was visiting his grandmother, "Brenda drove out there with all of his clothes, dumped it on [his grandmother's] front yard and told him not to come back to the house, and . . . [Ellerbee] just collapsed and sobbed."

For a couple of years, Ellerbee would visit his grandmother after school where "there was always food, she taught him to swim, [and] they played." Ellerbee described those years as the happiest of his life. However, the sense of safety and stability that his grandmother provided came to an end when Terry relocated them to Kenansville, a small community in Osceola County. There, the two lived in a filthy trailer.

Ellerbee began to heavily use methamphetamine and crack cocaine as a teenager. Dr. Israelian explained that methamphetamine is toxic to the brain and particularly affects the frontal lobe, an area of Ellerbee's brain that was already

impaired due to the chronic maltreatment he experienced as a child. Chronic methamphetamine use causes brain damage "that is sustained well past sobriety," and can be permanent. It also can cause hallucinations, delusions, and paranoia. It impairs rational thought, preventing users from regulating their actions in order to stop maladaptive behaviors. Dr. Israelian administered a battery of tests to Ellerbee, and the results were consistent with "what you expect to find with someone who has had methamphetamine exposure, and has frontal lobe deficits."

Although trial counsel did present mental health mitigation during the penalty phase through the testimony of defense expert Dr. Riordan, his testimony did not provide a detailed explanation of the effect that abuse and drug use can have on cognitive development. Instead, and at trial counsel's direction, Dr. Riordan's testimony focused on the possibility that Ellerbee's neuropsychological deficits were caused by fetal alcohol syndrome, head injuries, or both. During the penalty phase, Dr. Riordan opined that Ellerbee's family history "contains quite a bit of alcoholism and the mother in particular had a strong history of alcohol, so there's a[n] . . . indication that some of the neuropsychological deficits that I found were related to the pregnancy with him and the use of alcohol by the mother." However, during cross-examination, Dr. Riordan conceded Ellerbee had not been previously diagnosed with fetal

- 41 -

alcohol syndrome.[9] In fact, Terry testified during the penalty phase that Brenda did not drink when she was pregnant with Ellerbee. It is unclear why trial counsel directed Dr. Riordan to focus on fetal alcohol syndrome while simultaneously presenting testimony directly contradicting its existence.

## Application

We agree with the postconviction court's conclusion that trial counsel was deficient for failing to discover paternal neglect, paternal abuse, and the extent of paternal substance abuse. Although some witnesses described Brenda's abusive behavior, trial counsel failed to properly explore how her abuse affected Ellerbee's emotional and cognitive development. Moreover, Terry's physical abuse of Ellerbee was not revealed during the penalty phase, despite the fact that those who testified about the abuse during the evidentiary hearing were members of Ellerbee's family. Notably, these were not distant family members: they were aunts, uncles, and cousins who were close to Ellerbee as a child and, in some cases, even resided with him. They witnessed the abuse Ellerbee suffered and were more than willing to testify about it. However, these crucial witnesses were never contacted by trial counsel. It is well established that "counsel has a duty to make

---

9. Similarly, trial counsel presented as mitigation Dr. Riordan's testimony that Ellerbee suffered from mental health issues, including cognitive disorder, bipolar disorder, and attention deficit disorder. However, Dr. Riordan conceded on cross-examination that Ellerbee had never been diagnosed with any of these disorders.

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691. Here, trial counsel relied on a witness list compiled by Ellerbee, without instructing his mitigation specialists to find additional witnesses. Counsel's failure to conduct a complete investigation was unreasonable under the circumstances, and it resulted in an incomplete presentation of mitigation.

Further, as previously discussed, trial counsel presented conflicting testimony during the penalty phase. According to Dr. Riordan, trial counsel instructed him to focus on the theory that Ellerbee suffered from fetal alcohol syndrome, but this theory was undermined by Terry's testimony that Brenda did not drink while she was pregnant with Ellerbee. In addition, trial counsel instructed his mitigation specialists to focus on lay witness testimony of Brenda's abuse of Ellerbee, but this was undermined by Brenda and Terry's testimony that they only occasionally spanked him. This contradictory evidence would have confused the jury at best and, at worst, raised suspicions of defense counsel's honesty. Moreover, because Brenda and Terry's testimony was videotaped, trial counsel could—and should—have moved to redact the inconsistencies. No reasonable attorney would have presented such conflicting evidence during the penalty phase of a capital case. Thus, trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

We disagree with the postconviction court's conclusion that Ellerbee was not prejudiced by trial counsel's deficiency. Although the jury heard the testimony of various family members and friends who testified about Ellerbee's impoverished childhood and abusive mother, the jury never heard the testimony of family members who witnessed the chronic abuse he suffered at the hands of his father. We also disagree that trial counsel was not ineffective for failing to present expert testimony to explain how Ellerbee's cognitive development was affected by his drug use and the horrific physical, emotional, and psychological abuse he suffered as a child. The jury heard defense expert Dr. Riordan's mitigation theory of fetal alcohol syndrome, only to later hear completely contradictory testimony. Moreover, although the jury heard that Ellerbee's mother abandoned him as a child, and that he was exposed to drugs at a young age and used them heavily as a teenager, they did not hear how these experiences affected the development of his brain.

Had the jury heard about the extensive abuse Ellerbee suffered and how it affected his emotional and cognitive development, in addition to the other mitigation presented during the penalty phase, there is a reasonable probability that they would have arrived at a different conclusion regarding sentencing. Accordingly, we hold that confidence in the outcome of the penalty phase has been undermined, and penalty phase counsel was ineffective. Therefore, even if

Ellerbee was not receiving relief pursuant to <u>Hurst</u> and <u>Mosley</u>, he would be entitled to a new penalty phase proceeding pursuant to <u>Strickland</u>.

**PETITION FOR WRIT OF HABEAS CORPUS**

In his petition for writ of habeas corpus, Ellerbee argues his death sentence is unconstitutional under <u>Hurst v. Florida</u>. In <u>Hurst v. Florida</u>, the United States Supreme Court held that Florida's capital sentencing scheme is unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." 136 S. Ct. at 619. On remand, in <u>Hurst v. State</u>, 202 So. 3d 40 (Fla. 2016), we held:

> [B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

<u>Id</u>. at 57. In <u>Mosley v. State</u>, 209 So. 3d 1248 (Fla. 2016), we concluded that <u>Hurst</u> applies retroactively to those defendants whose sentences became final after the Supreme Court decided <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). <u>Mosley</u>, 209 So. 3d at 1283. In light of the nonunanimous jury recommendation to impose a sentence of death, it cannot be said that the failure to require a unanimous verdict here was harmless. <u>See, e.g.</u>, <u>Hodges v. State</u>, 213 So. 3d 863, 880-81 (Fla. 2017).

- 45 -

# CONCLUSION

For the foregoing reasons, we affirm the denial of postconviction relief. However, we grant the petition for writ of habeas corpus, vacate Ellerbee's death sentence, and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in result with an opinion, in which POLSTON, J., concurs.
LAWSON, J., concurs specially with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, J., concurring in result.

I agree with the majority's conclusion that Ellerbee is entitled to relief on his ineffective assistance of counsel claim regarding the penalty phase proceedings. See majority op. at 28-29.  I therefore concur with the decision to vacate the sentence of death.

POLSTON, J., concurs.

LAWSON, J., concurring specially.

I fully concur in the majority opinion except for the conclusion that Ellerbee is entitled to relief pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017), and Mosley v. State, 209 So. 3d 1248 (Fla. 2016). For reasons explained in Okafor v. State, 225 So. 3d 768, 775-76 (Fla. 2017)

- 46 -

(Lawson, J., concurring specially), I specially concur in that portion of the opinion

granting Hurst relief.

An Appeal from the Circuit Court in and for Okeechobee County,
    Dan Lewis Vaughn, Judge - Case No. 472006CF000814CFAXMX
And an Original Proceeding – Habeas Corpus

Neal A. Dupree, Capital Collateral Regional Counsel, Nicole M. Noël, Assistant
Capital Collateral Regional Counsel, and Marta Jaszczolt, Staff Attorney, Southern
Region, Fort Lauderdale, Florida,

    for Appellant/Cross-Appellee/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner,
Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Cross-Appellant/Respondent